**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHNATHAN ANDREW DOODY,
                 *Petitioner-Appellant,*

          v.

CHARLES L. RYAN; MEGAN SAVAGE;
ATTORNEY GENERAL OF THE STATE
OF ARIZONA,
                 *Respondents-Appellees.*

No. 06-17161

D.C. No.
CV-98-00528-EHC

OPINION

On Remand from the United States Supreme Court

Filed May 4, 2011

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Betty B. Fletcher, Harry Pregerson, Stephen Reinhardt,
Pamela Ann Rymer, Andrew J. Kleinfeld, Sidney R. Thomas,
Kim McLane Wardlaw, Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Concurrence by Chief Judge Kozinski;
Dissent by Judge Tallman

**COUNSEL**

Victoria B. Eiger (argued) and Nathan Z. Dershowitz, Dershowitz, Eiger & Adelson, P.C., New York, New York, for petitioner-appellant Jonathan Doody.

Terry Goddard, Attorney General, Kent Cattani, Chief Counsel, and Joseph T. Maziarz (argued), Assistant Attorney General, Criminal Appeals/Capital Litigation Section, Phoenix, Arizona, for respondents-appellees Dora A. Schriro, and Megan Savage.

---

**OPINION**

RAWLINSON, Circuit Judge:

This case emerged from a horrendous crime — the murder of nine individuals, including six monks, inside a Buddhist temple. The ensuing investigation ensnared Petitioner Jonathan Doody, a seventeen-year old high school student. Although Doody eventually confessed to participating in the nine murders, he challenged his confession, asserting that the *Miranda*[1] advisements he was given were inadequate and that his confession was involuntary. In our opinion reported at 596 F.3d 620 (9th Cir. 2010) (en banc), we agreed on both counts. Specifically, we concluded that the advisement provided to Doody, which consumed twelve pages of transcript and completely obfuscated the core precepts of *Miranda*, was inadequate. We also held that nearly thirteen hours of relentless overnight questioning of a sleep-deprived teenager by a tag team of officers overbore the will of that teen, rendering his confession involuntary. *See id.* at 622-23. We concluded that the state court rulings to the contrary were an unreasonable

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 444 (1966), requires that, prior to questioning, a suspect be apprised of his constitutional rights to remain silent and to consult an attorney.

determination of the facts and an unreasonable application of governing Supreme Court precedent. *See id.* at 636, 653. The United States Supreme Court granted certiorari, vacated our judgment and remanded this case to us for further consideration in light of *Florida v. Powell*, 130 S. Ct. 1195 (2010). *See Ryan v. Doody*, 131 S.Ct. 456 (Oct. 12, 2010) (Mem.). Having reviewed the facts and circumstances of this case in light of *Powell*, we reaffirm our prior rulings.

## I.  BACKGROUND

"On the morning of August 10, 1991, members of the Wat Promkunaram Buddhist Temple discovered nine bodies inside the temple (the temple murders). The victims, including six Buddhist monks, lay face down in a circle, each shot in the head." *State v. Doody*, 930 P.2d 440, 443 (Ariz. Ct. App. 1996). Temple living quarters were ransacked, and personal property was missing. *See id.*

Approximately one month after the temple murders, Phoenix detectives received an anonymous tip implicating four men from Tucson (the Tucson Four). During interrogations, the four suspects made inculpatory statements, resulting in murder charges against them.[2] *See id.*

The police identified the murder weapon as a Marlin Model 60 .22 caliber rifle (Marlin rifle). *See id.* Investigators received a report from Luke Air Force Base that a military policeman had discovered a Marlin rifle while searching a vehicle in an unrelated incident. *See id.* The rifle was recovered from its owner, Rolando Caratachea (Caratachea), and identified as the temple murder weapon. *See id.* When confronted, Caratachea denied involvement in the temple murders. He steered the investigators to Doody and another

---

[2]All charges against the Tucson Four were subsequently dismissed. The State has never disputed that the Tucson Four's confessions were false.

minor, Alessandro Garcia (Garcia), whom he reported had borrowed the rifle shortly before the murders. *See id.*

Police officers approached Doody on October 25, 1991, at a high school football game, where Doody was participating in a flag ceremony as a member of the high school Reserve Officers Training Corps (ROTC). Doody voluntarily accompanied the police officers to the station for questioning.

Doody's interrogation began at 9:25 p.m. and concluded at 10:00 a.m. the next day. *See id.* at 444. Prior to commencing the interrogation, Detective Riley purported to advise Doody of his constitutional rights as required by *Miranda*. His recitation of *Miranda's* basic warnings consumes twelve pages of transcript, largely a byproduct of the detective's continuous usage of qualifying language. The *Miranda* form designed to be used when questioning juvenile suspects contained the following uncomplicated advisements:

1. **You have the right to remain silent.** (This means that you do not have to talk to me or answer any questions about this offense. You can be quiet if you wish.). . .

2. **Anything you say can and will be used against you in a court of law.** (This means that anything you tell me, I can use later against you in court . . .). . .

3. **You have the right to have an attorney present prior to and during questioning.** (This means, if you want one, you are allowed to have a lawyer here before and during my questions to you . . .). . .

4. **If you cannot afford an attorney, you have the right to have one appointed for you prior to questioning.** (This means if you do not have the money

to get a lawyer, if you wish, one will be given to you free of charge before you are questioned.). . .

Juvenile *Miranda* Warnings Form (October 25, 1991). What began as the reading of a single-page *Miranda* form morphed into a twelve-page exposition that negated the intended effect of the *Miranda* warning.

Detective Riley began by informing Doody that the warnings were merely a formality that Doody should not take out of context:

> Ah, what I'd like to do first though Jonathan since we're in kind of a formal setting and things like that and because DAVE [Munley's] a police officer and I'm a police officer and things like that ah sometimes some of the questions that we get into are, are a little bit sensitive and ah things like that. Ah, and what I'd like to do is before we, we go into that is ah, read something to you ah, and so that you understand some of the protections and things that ah, that you have. It's not meant to scare you or anything like that, ah, don't, ah, don't take it out of context, okay.
>
> . . .
>
> Ah, I'm sure you've heard this thing and you've heard it said on t.v. and things like that and it's not quite like t.v. portrays it ah, *it's a little more, little less technical and a little less heavy if you want to put it ah that way . . . What, what, it's called is a Miranda warning okay. Have you heard that before?*
>
> Doody: *No.*
>
> They call it Rights on t.v., okay. What, what that is and basically all that is Jonathan is, it's not necessar-

ily something that is, like on t.v. where they portray
it when somebody's ah guilty of doing something,
ah, we read these things to people on somewhat of
a regular basis, whether they're responsible for doing
something or not, okay. So I don't want you to feel
that because I'm reading this to you that we neces-
sarily [sic] that you're responsible for anything, it's
for your benefit, it's for your protection and for our's
[sic] as well, okay?

Doody Interrogation Transcript, Tape 1, pp. 2-4 (emphases
added).

Detective Riley then informed Doody that he was reading
the *Miranda* warnings verbatim from a form. *See id.* at p. 8.
However, the detective deviated significantly from the form,
while informing Doody of his right to counsel. He stated:

Okay, and the next one states that you have the right
to have an attorney present prior to and during ques-
tioning, and what that means [sic] that if you want
one, you're allowed to have a lawyer here before and
during you know my questions to you, okay. And
then an attorney is a lawyer who will speak for you
and help you concerning the crime or any kind of
offense that ah we might think that you or somebody
else is involved in, if you were involved in it, okay.
Again, it [sic] not necessarily mean that you are
involved, but if you were, then that's what that
would apply to okay.

*Id.* at p. 10.

The interrogation commenced with casual questions from
both Detective Riley and Detective Munley about Doody's
roommates and friends, including whether any of them owned
guns. Doody volunteered that his friend Caratachea owned a
gun, but denied that he ever borrowed or shot the gun. The

two detectives then switched the focus of the questions to the temple murders, asking Doody to detail his whereabouts at the time of the murders and to describe how he became aware of the crime. Doody responded that on the night of the murders, he went to a movie with a friend and returned home. The two officers followed up by asking additional questions about the temple, Doody's prior visits to the temple and the victims.

Approximately one hour into the interrogation, Detective Riley paused to lecture Doody about the importance of telling the truth. He also asked a pointed question: whether Doody or anyone Doody knew had ever borrowed Caractachea's rifle. Doody denied that he had, but stated that Garcia might have done so. At that point, Detective Riley apprised Doody that there were some things about the gun that he knew Doody was aware of, and he urged Doody to come clean.

Detective Riley again asked Doody about his whereabouts when the murders occurred and whether he knew anything about the murders other than what was reported in the news. When Doody once more denied any knowledge of the murders, Detective Riley repeated his warning about the importance of Doody telling all, and he informed Doody that the detectives knew Doody was lying when he denied borrowing Caratachea's rifle. In response, Doody reiterated that he never borrowed the rifle, but Garcia might have.

Following Doody's repeated negative response to the question of borrowing Caratachea's rifle, both detectives proceeded to lecture Doody on the importance of his telling the truth. In the midst of the lecture, the two detectives confronted Doody with their "knowledge" that Doody and at least one other person borrowed the rifle. They demanded information confirming their knowledge, telling Doody that "its [sic] so important for you, for you to tell us. *I mean you have to tell us. You have to.*" Doody Interrogation Transcript, Tape 3, p. 27 (emphasis added).

Almost immediately after the two detectives told Doody he *had* to tell them about borrowing the rifle, Doody obliged. He told the two detectives that he and Garcia borrowed the rifle well before the temple murders. This admission prompted several more sternly couched lectures on the importance of telling the truth, and the detectives' knowledge that Doody was lying. The detectives also increased the pressure on Doody by informing him that Caratachea's rifle was the murder weapon. Nevertheless, Doody maintained that he returned the rifle to Caratachea prior to the murders. He continued to deny knowledge of, or involvement in, the murders in the face of repeated questions and accusations that he was withholding information from the detectives.

In the middle of the night, Doody became virtually non-responsive to the detectives' questioning, even though a third detective, Detective Sinsabaugh, who had interviewed Doody in September, joined the tag team. From that point, the pressure intensified. Detective Riley began with:

> Why if you didn't kill anybody, then what is what is keeping you from making people understandable [sic] believe that. 'Cause if you didn't kill anybody, doing what you're doing right now isn't going to convince anybody . . . They're gonna say and this is only speaking it out common sense fashion how people normally perceive things, is it if you didn't kill anybody why is he lying, why won't he tell what happened, there is [sic] got to be a reason for that; and the reason that most people would come to is that you probably kill [sic] them and it is won't admit it. So we can get pass [sic] that point and deal with the fact that he didn't kill anybody, but this is why your problem in coming across with what he knew and reasons were this and this and hey! I think there [sic] a probably pretty good reasons [sic] otherwise you wouldn't have such a problem Jonathan, but help us understand that, and by understanding it

you're going to help yourself out tremendously 'cause we have to know. Com'mon!

Doody Interrogation Transcript, Tape # 8, pp. 1-2. Doody responded, "I don't know anything else." *Id.* at p. 2.

Detective Sinsabaugh chimed in: "You know me don't you Jonathan? How'ya doing my friend?" *Id.* at p. 6. The detective instructed an unresponsive Doody:

Remember we talked about honor. I need your help on this one. I know what's up. I need you to help on this one, okay? You got a duty to help us Jonathan; I know exactly what went down, my man, and you got a duty to help us and we can work this thing out together and I'm coming to you straight up Jonathan. I'm serious. *These guys* [the other two detectives] are trying to give you an opportunity Jonathan for you to help us to be *on our team* and that's why they're spending this time with you. Just like that night I talked to you, it's no game now Jonathan. I know you though Jonathan, I know . . . your family. I know where you have been raised, and I don't think Jonathan Doody is a cold blooded killer. These guys were cowards Jonathan. You got mixed up with some dumb punks, and you gotta help us on this Jonathan. You gotta help us on this 'cause it's no game now. I mean that you gotta help us on this. This is not a game; I'm not playing with you Jonathan. I know your family and everything. Please help me on this Jonathan. We can we can talk and we'd see how we can ever work this thing out, but you gotta be straight up front with me. If if you lie to us Jonathan, then we're not gonna be able to believe the truth. If you lie to us, I'm not gonna be able to believe whether or not you are [sic] killer and I don't believe that Jonathan and that's why I took the time to come in and talk to you, 'cause I care about you man. Let

it out, Jonathan. Now is the time let it out. Let it out, Jonathan. Tell's [sic] us what's up; take some pride in yourself we'll, we'll work it out Jonathan, but it's not gonna help leaving it in. I need to know your part; we already know what went down Jonathan. Help me on this one.

*Id.* at pp. 6-7 (emphases added).

Besides reiterating that he didn't do anything, Doody was non-responsive. The three detectives continued in tandem:

Detective Munley: Tell us what happened. We gotta hear it from you. Get it all cleared up Jonathan, you can do it. It has to come out Jonathan.

Detective Sinsabaugh: Jonathan now is the time.

Detective Munley: Go ahead Jonathan please. You're not afraid to take stands, just get it out, just get it out . . .

Detective Munley: Do it Jonathan; I can help you. Let it out Jonathan.

Detective Sinsabaugh: Trust me on this one. Jonathan. Whose plan was it Jonathan? Tell me Jonathan, whose plan was it? I'll work with you on it. Go ahead, Jonathan, go ahead. Help us on this.

Detective Riley: Jon you can do it. Whose idea was it?

Detective Sinsabaugh: Jonathan let it out, let it out take a deep breath let it out now. Let it out and tell us what happened.

. . .

Now is the time, let it out. Get it out of you, it's a new beginning for you.

. . .

Jon, this is bull shit. Get it out Jonathan 'cause then I'm not gonna believe you when you do tell us we, we know what's up. Now let it out now, and we'll work together on it.

Detective Munley: Jonathan, who are we talking about here? You gotta take this position now. You better take a hold of this now.

Detective Riley: This is your time, Jon. This is your opportunity get [sic] it out.

Detective Sinsabaugh: Jonathan, I know you're involved. I don't wanna go out that door; I don't wanna believe other one's, other people's story. I want it from you first hand. Jonathan, it's time. I'm serious, it's time.

. . .

Take a stand. Be a man . . .

Detective Riley: You have to . . .

. . .

Detective Sinsabaugh: Now come clean with me Jonathan; come clean.

. . .

Detective Munley: Rollie was involved, wasn't he?

Detective Riley: Com'mon Jonathan, it's not that difficult. Either he was or he wasn't. Was he? Was he or wasn't he involved? Jonathan was he?

Doody: I don't know.

Detective Riley: Yes, you do know. Was he?

Detective Sinsabaugh: Jonathan, I'm going out this room. I'm gonna talk to other people. I thought for surely [sic] I could come to you; you're not thinking in your interest Jonathan. How we talked about the honor; I don't see any of that honor my man.

Detective Riley: Try, you can do it. Gotta get it, you gotta release it Jonathan. It's not gonna go away. Man you gotta get it out. Just go ahead and say it. It's all in [sic] the tip of your tongue. Just let it out Jon . . . [W]as Rollie involved? Jonathan it's not that hard. Either he was or wasn't. Com'mon, do it. Do it now. Either he was or he wasn't. Was he involved? Yes or no? Com'mon, com'mon! . . .

Detective Munley: Get it out . . .

Detective Sinsabaugh: I'm with you. I'm with you. You gotta help me on this one. We gotta make this right Jonathan. This's no game Jonathan; I'm being honest with you.

Detective Munley: He was involved, wasn't he Jon?

Detective Sinsabaugh: It's your side of the story.

Detective Munley: He was, wasn't he.

Detective Sinsabaugh: Com'mon Jonathan.

Detective Munley: Jonathan, look at me; he was, wasn't he? Go ahead Jonathan.

. . .

Detective Sinsabaugh: You were involved Jonathan. You were involved.

Detective Munley: We gotta know the extent of your involvement. We gotta have your version Jon.

Detective Sinsabaugh: Man, you gotta get it out.

Detective Munley: Tell it, Jon.

Detective Riley: Jonathan can you honestly sit there and tell myself and Dave and Rick right now that you were not at that temple.

Detective Sinsabaugh: No, 'cause Jonathan Doody doesn't lie.

Detective Munley: Jonathan, can you?

Detective Riley: Com'mon this is not that hard. You know what we've talked about throughout this whole conversation. If you're there, we can deal with that; but we gotta know, we gotta hear it from you. You have to tell us. Yes or no? Were you or weren't you? Yes or no? Jonathan, com'mon. Yes or no? Yes or no? Yes or no? Yes or no? It's real simple. Were you or weren't you. Just tell me, yes or no. Com'mon yes or no, it's real simple.

. . .

Detective Sinsabaugh: Join the team. Let's work this thing out together. I'm not gonna tell you, you can't Jonathan. Let's straighten this shit up.

. . .

Doody: (Murmur)

. . .

Detective Sinsabaugh: Jonathan do it.

Detective Riley: We have to know; you have to let us know. If you don't, let us know know [sic] body else is gonna do that for you. Either you tell us you were or weren't, it's really simple. I know it's a struggle right now, but you have to let us know that. Whether or not you were there. Simply yes or no. What is it, which one is it? Com'mon, take control right now.

Detective Sinsabaugh: Answer Jonathan, answer.

Detective Munley: You can do it Jon.

. . .

Detective Munley: Jon, it's not the end of the world. It's not the end of the world.

. . .

Jonathan you can do it.

Detective Riley: Please! Jonathan, com'mon. You can deal with this; you can take control of this situation. The way to start with that is to do this now by telling us whether or not you were there. Were you or not there? Jonathan Please tell us now. Let us help you . . .

Detective Munley: Get it out . . .

Detective Riley: Give us the opportunity.

Detective Munley: Get it out. Go ahead.

Detective Riley: Grab a hold of this opportunity. Let us help you. Like Rick's been telling you, trust us.

Detective Sinsabaugh: Jonathan, Jonathan, Jonathan look at me. This is flat out bull shit man. What what what what'd, you been brought up better than this. What the hell does this stand for, Okay? Are you gonna cover for bunch [sic] of cowards. I'm trying to convince these people Jonathan that you didn't kill anybody. You got something in here, and you you're sitting here playing a game and I'm not gonna put up with it. You're gonna sit there and cover for bunch [sic] of cowards. I think Jonathan, I'd come to you straight up and I'm gonna give [sic] chance to answer and I want you to come clear with this. Don't cover for these guys. They're cowards, Jonathan. Tell me.

Doody: I can't.

Detective Sinsabaugh: Why? I'll work with you, why? Why Jonathan? Why? Talk to, I'd talk to you the other night Jonathan; we can talk. Me and you can talk Jonathan . . . don't freeze up on me man. You freeze up on me like this, I can't talk to you. Talk to me. Why can't you and we'll work it out. Just sit down and discuss this. . . . Jonathan, take charge man. Your [sic] soldier man, you don't, you you don't you can say what's on your mind and tell me Jonathan. Tell me. Tell me so I can work this out with you. Go ahead my man, tell me. Tell me, trust me my man. Trust me. Trust me so we can work [sic] out; I need your help Jonathan. How did you get involved in it and talk. How did you get involved

in it? We'll work it out Jonathan, we'll work it out. I'm worried about your family, too. We'll work it out. You need to help me Jonathan. Jonathan, Jonathan don't. You told me you can't, now why? Jon no, Jonathan tell me. Why? Let's work it out together. Jonathan look at me my man, trust me on this. Let's work this thing. Why? If you wanna say it Jonathan, why? Why? I I care about you Jonathan; you're [sic] family wanna know why . . .

*Id.* at pp. 10-19.

Between 3:15 a.m. and 3:56 a.m., after making a brief comment about there not being a threat to his family, Doody Interrogation, Tape 9, p. 1, Doody again became silent. The detectives continued without any response from Doody:

Detective Sinsabaugh: Jonathan, who did they threaten [sic] let it out? I know what's up Jonathan. Tell me about it lets [sic] work this out. Jonathan I need your help to prove that your [sic] not a killer Jonathan. You went there it went to shit Jonathan it wasn't your idea. You just got messed [sic] with the wrong guys, Jonathan look at me. Don't sst [sic], what's the problem? Jonathan tell me. Let it out, who, you said not me who? Who Jonathan? Jonathan be a man about this. Tell me.

Detective Riley: Who's [sic] ideal [sic] was it Jonathan?

Detective Sinsabaugh: Tell him Jonathan. Tell him Jonathan, who's [sic] ideal [sic] it was. Let's get this out, there you go . . .

Detective Sinsabaugh: Ideal [sic] was it?

Detective Munley: Go ahead Jonathan. It's easy, who's [sic] ideal [sic]? Let it out Jonathan. Go ahead.

Detective Sinsabaugh: Jon, Jon, Jon trust me on this, Jonathan. It's the only way we can work it out is if you're up front Jonathan. Now I talked to you tonight, the other time we talked you you you intelligent [sic] help us on this talk to us.

Detective Munley: Who's [sic] idea was it Jonathan?

Detective Sinsabaugh: Jonathan I'm gonna have to leave the room are you gonna help me on this? Are you gonna trust me on this? You can't trust those guys. You can trust me now tell me Jonathan. Jonathan you're wasting time, now tell me. You want to tell us, so let's just tell it now.

Detective Munley: Tell Jonathan.

Detective Sinsabaugh: Jonathan, Jonathan who's [sic] ideal [sic] was it? Jonathan you just said it, who's [sic] ideal [sic] was it?

Detective Munley: OK Jonathan.

Detective Sinsabaugh: You're gonna cover for a cold blooded killer?

Detective Munley: Jon go ahead and let it out. Go ahead Jon.

Detective Sinsabaugh: Jon Jon Jon Jon are you gonna cover for a cold blooded killer, now let it out.

Detective Munley: Go ahead Jon. Get it out Jon. Were you there? Jon.

Detective Sinsabaugh: Jon Jon tell tell me so I know what we're up against. Why are you scared to tell us? Huh, Jon Jon you got to answer me why are you scared to tell us, answer me. No Jon why are you scared to tell us? I'm not gonna let you do this to yourself, why are you scared to tell us? No, Jon you're gonna answer me, why are you scared to tell us? I'm concerned about ya and I'm I'm gonna stay here until I get an answer, why are you scared to tell, let me help you on this Jon. Jon, why are you scared to tell us? Huh? Jon, Jon answer me. Why are you scared to tell us, I'm not gonna let you do this. Now you you start talking to me. Tell us Jon. Jon Jonathan tell us.

Detective Munley: Let it go. You just said it.

Detective Sinsabaugh: Trust me on this [Jonathan]. This is the only way.

Detective Munley: Go ahead Jon. Get it out Jon, just get it over with it has to come out. It has to come out, go ahead. Go ahead Jon.

Detective Sinsabaugh: Jon look what you're holding inside you want to tell us just tell us. Jon, Jon would you tell me? Look at me Jon, Jon don't look away, look at me Jon you're a soldier tell me what's up. Jon no no no tell me Jon talk to me Jon. Jon no no this guy it's not you're not gonna cut it that way man, you're gonna be a man about it. You're gonna talk to me Jon.

Detective Riley: Who are you afraid of Jon?

Detective Sinsabaugh: You you gonna get this out in the open now Jon that isn't going to buy it, you're you're you're an ROTC you're a soldier now start

talking to me Jon don't sit there like that talk to me. Jon you remember what's my name? What's my name? What's my name Jon? What is my name? What is my name Jon?

Detective Riley: Don't you remember his name?

Detective Sinsabaugh: Do you remember me talking to you at school? I called you at school, your counselor and you called me? Do you remember yes or no?

Doody: Yes.

Detective Sinsabaugh: OK, why is that so hard? Yeah I talked to him a couple of months maybe. Jon Jon do you want to talk or not?

Doody: I'll pull up a chair.

Detective Munley: Just get it out.

Detective Sinsabaugh: Jon, excuse me. What's the deal are you gonna talk to me or not? Who am I Jon? What's my name? Well talk, what is my name Jon? You can't remember it? You remember me talking to you?

Doody: Yes.

Detective Sinsabaugh: OK speak up OK we're men now. Could you remember me talking to you?

Doody: Yes.

Detective Sinsabaugh: OK speak up, Jon. OK I'm talking you [sic] straight up like a man, do you remember me talking to ya?

Doody: Yes.

Detective Sinsabaugh: OK I, you need to speak up through [sic] when you're talking to me. What is my name? You you remember my name? Yes or no, do you remember my name?

Doody: Yeah.

Detective Sinsabaugh: OK, what's my name?

Doody: Richard Sinsabaugh.

Detective Sinsabaugh: Well why is that so hard? I'm I'm here for ya, you got to talk, why why you act [sic] that you don't talk like that? Tell us these guys are trying to help you now what's up? Jonathan, that's it were [sic] talking now. Now, I know you're involved Jonathan now now you gonna help me on this thing. So what's the deal, what don't don't start this stuff talk to me OK, lets [sic] talk about the problem what problem are we having right now? What's the problem? You say you're afraid of something, what are you afraid of?

Doody: I'm not afraid of anybody.

Detective Sinsabaugh: OK what's the problem talk to me that's what we need to talk about what's the problem? You're afraid of the family? Right?

Doody: No.

Detective Sinsabaugh: What? Talk to me that's what I need, so I can discuss it with ya what? Then what? Jon tell me, what?

Doody: I'm afraid for somebody.

. . .

Detective Sinsabaugh: Oh, are you afraid Vickie find [sic] out about you? What are you afraid of? I'm not a mind reader Jonathan you got to tell me, tell me. It's not that hard, tell me Jonathan seriously, tell me. OK? I talked to you Jonathan my God you're an intelligent guy, what's the deal tell me, you're afraid for Vickie what what are you afraid of Vickie for? What are you afraid of of for Vickie? Tell us so we can get over this hurdle this Vickie. Hurdle . . . what's the problem? Jon Jonathan tell me what's the problem? Did you kill anyone there Jonathan? Look me in the eye yes or no, did you kill anyone there?

Doody: No.

Detective Sinsabaugh: I can't hear you Jonathan, did you kill anyone there takes [sic] a stand.

Doody: No.

Detective Sinsabaugh: OK, why is it that [sic] so hard to say is it because you might of, I don't think you killed anyone Jonathan, but I know you were there. Jonathan I'm gonna ask you this and don't give me information any doubts [sic] on it, cause I don't think you killed anyone, did you kill anyone at the Temple?

Doody: No.

Detective Sinsabaugh: Why is that hard to answer? You were there though Jonathan, right? Right? Jonathan, were you at the Temple? Jonathan, were, I'm asking you flat out, were you involved? Jonathan were you involved, don't lie to me yes or no? Tell me Jonathan, were you involved, I need to know so

we can get over this and work on it. Were you involved? Tell me Jonathan. You were involved Jonathan, tell me. I know that but I need to know if you killed anybody, you said you didn't kill well how do I know if you're lying to me about this? Were you involved? Jonathan were you involved? Answer me, answer me Jonathan. Jonathan answer me. Answer me. What what's the problem answer me Jonathan what what are we going through all this, we want to work things out, what's the difference, we all [sic] ready know what's up Jonathan you're here, ya know we took you out of ROTC, this isn't a game OK you need you [sic] to help us out on this. And why you doing this, this doesn't look like a guy who wants to help us out, what's the problem? Were you involved?

Interrogation Transcript, Tape 9, pp. 1-8. Doody finally responded, "Yes." *Id.* at 8.

Over the course of several more hours of interrogation, Doody gave the detectives the "confession" they sought. Doody informed the detectives that Caratachea and Garcia approached him with a plan to conduct a war game with the goal of surrounding the temple without triggering the security system. Doody went to the temple with Caratachea, Garcia, and two others, George Gonzalez (Gonzalez) and his friend. Doody explained that he had no intention of entering the temple but, once past the security sensors, he followed the others inside. According to Doody, Caratachea, Garcia, Gonzalez, and the other participant ransacked the temple's living quarters and gathered the victims into the main room. After one of the monks recognized Gonzalez, Doody was ordered to go outside and confirm that the walls were sound-proof. Doody maintained that the shootings occurred while he was outside and that he did not know who fired the shots. *Doody*, 930 P.2d at 444.

On the same night that Doody was interrogated, Garcia was also questioned. Garcia identified Doody as the mastermind of the plan to rob the temple. Garcia's version of events was that once they were inside the temple, Doody was determined to leave no witnesses. According to Garcia, he attempted to persuade Doody not to shoot the victims but was unsuccessful. Instead, Doody shot each victim in the head with a rifle Doody borrowed from Caratachea. Garcia stated that he and Doody were the only participants in the murders.

Investigators subsequently searched Garcia's home and discovered several items taken from the temple. They also recovered a shotgun that matched shells from the crime scene. The two confessions and the evidence collected at Garcia's home resulted in dismissal of all charges against the Tucson Four from whom the police had previously obtained confessions. Doody and Garcia were subsequently charged with the murders. *See id.*

Prior to trial, Doody and Garcia filed motions to suppress their confessions. *Id.* At the suppression hearing, Detective Riley described Doody as "very polite, attentive, and just overall pleasant." Suppression Hearing Transcript, October 27, 1992, pp. 68-69. Detective Riley described using "a standard issue juvenile *Miranda* form issued by the office" to inform Doody of his *Miranda* rights. *Id.* at 77-78. According to Detective Riley, he went through the form with Doody, who initialed the applicable areas of the form. Detective Riley stated that Doody was "very attentive. [Doody] made eye contact with [Detective Riley] as [he] spoke to [Doody] and, again, was polite and courteous." *Id.* at 81. Detective Riley stated that Doody did not display any doubt while answering the questions. He estimated that it took fifteen to twenty minutes to administer the *Miranda* warnings.

When asked if Doody appeared tired during the interrogation, Detective Riley responded, "I'd have to say for the most part no. [Doody] didn't really display any real overt sign of

being fatigued or tired." *Id.* at 89. Detective Riley testified that he used a "[q]uiet and calm" voice when he questioned Doody. *Id.* at 90.

Detective Riley confirmed that there were long periods during the interview when Doody remained silent while Detective Riley kept asking questions. During these periods, Doody's "posture began to deteriorate. His attentiveness also deteriorated. And his eye contact dropped to where he would look at the ground for long periods of time. He would clinch his beret in his hand." Suppression Hearing Transcript, October 28, 1992, p. 35. Detective Riley agreed that certain periods could be described as an "impasse." *Id.* at 37. Detective Riley acknowledged that the transcripts reflected a four-page speech in which he was trying to get Doody to provide additional information. After this "four-page . . . speech," Doody responded, "I don't know anymore." *Id.* at 43.

Following the suppression hearing, the trial court denied both Garcia's and Doody's motions to suppress. *Doody*, 930 P.2d at 444. Garcia entered into a plea agreement, "pursuant to which the state agreed not to pursue the death penalty and Garcia agreed to testify against Doody." *Id.* "In addition, Garcia pled guilty to nine counts of first degree murder and one count of burglary in connection with the temple murders, as well as one count of first degree murder in an unrelated homicide (the Cameron murder)." *Id.*

At Doody's trial, Garcia testified consistent with his statements to the investigators. *See id.* Doody was not allowed to cross-examine Garcia regarding the Cameron homicide or other unrelated and uncharged offenses Garcia committed with Caratachea, "including a series of burglaries and conspiracy to commit murder and armed robbery (the Cruz offenses)." *Id.*

The jury ultimately convicted Doody on all counts. However, the verdict forms revealed that the jury premised

Doody's first degree murder convictions on felony murder rather than on premeditated murder. *Id.*

Doody appealed his convictions to the Arizona Court of Appeals. *Id.* at 445. Addressing Doody's confession, the Court of Appeals observed that "the troublesome length of Doody's questioning does not, in itself, establish that the officers overcame Doody's will to resist confessing." *Id.* at 446 (citation omitted). The Court of Appeals opined:

> Other factors indicate that, despite the length of the interrogation, Doody confessed voluntarily. Although the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea's rifle at the time of the temple murders after approximately two and one-half hours of questioning. Doody admitted he had participated in the temple robbery after approximately six and one-half hours of questioning, and his description of the events at the temple spanned nearly two hours. During the remaining hours, the detectives reviewed Doody's testimony and probed for a connection to the Tucson Four.

*Id.*

Additionally, the Court of Appeals concluded that "[a]lthough Doody characterizes the tone of the interrogation as coercive, the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview." *Id.* The Court of Appeals noted that "[e]ach of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers' testimony." *Id.* The Court of Appeals found that there was "no evidence that calls into question the testimony that Doody remained alert and responsive." *Id.*

The Court of Appeals rejected Doody's argument that the police officers pressured him into a confession:

> The officers used a variety of approaches in questioning Doody. They emphasized Doody's experience in the high school honor guard and color guard and appealed to his sense of honor as a soldier. At impasses in the interview, the police captain entered the interrogation room and likened himself to a commanding officer in the military, encouraging Doody to trust and confide in him. The officers feigned empathy with Doody's situation and pleaded with Doody to prove his innocence. The officers also indicated to Doody that other suspects had implicated him in the temple murders and that Doody's best defense would be to explain his version of the events.

*Id.* at 447. The Court of Appeals held that "[t]he tactics, though deceptive in part, were not so egregious as to overcome Doody's will and . . . the record contradicts Doody's claim on appeal that the method of interrogation induced him to confess." *Id.* at 447-48.

The Arizona Court of Appeals also determined that the police officers properly provided Doody with the requisite "clear and understandable" *Miranda* warnings. *Id.* at 449. Specifically, the Court of Appeals concluded that "[t]he officers read each warning from a standard juvenile form and provided additional explanations as appropriate." *Id.*

Doody challenged the Arizona Court of Appeals decision in a federal habeas petition, which was denied. However, the district court granted a certificate of appealability concerning the voluntariness of Doody's confession and the adequacy of the *Miranda* warnings given Doody.

In *Doody v. Schriro*, 548 F.3d 847 (9th Cir. 2008), a panel of this court reversed the district court's denial of Doody's

habeas petition. Appellee Dora Schriro filed a petition for rehearing en banc, which we granted. *Doody v. Schriro*, 566 F.3d 839 (9th Cir. 2009).

## II. STANDARDS OF REVIEW

"We review the federal district court's decision to deny [Doody's] habeas petition de novo." *DeWeaver v. Runnels*, 556 F.3d 995, 997 (9th Cir. 2009) (citation omitted).

> [B]ecause [Doody] filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must deny the petition unless the state court's adjudication of [Doody's] claims resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009) (citation omitted).

Under AEDPA, "[t]he state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *DeWeaver*, 556 F.3d at 997 (citations and internal quotation marks omitted). "Under applicable federal habeas law, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence or unless based on an unreasonable evidentiary foundation." *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (citations omitted). We review the decision of the Arizona Court of Appeals as the last reasoned state court

decision on the matter. *Holley v. Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009). We apply the unreasonable application prong of AEDPA because the Arizona Court of Appeals identified the applicable governing rule for each issue.

## III.   DISCUSSION

### A.   Adequacy of the *Miranda* Warnings

**[1]** "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. "[T]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause, [the Supreme Court] in *Miranda* concluded that the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored[.]" *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (citations and internal quotation marks omitted). "*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.* (footnote reference omitted). "*Miranda* addressed interrogation practices likely to disable an individual from making a free and rational choice about speaking, and held that a suspect must be adequately and effectively advised of the choice the Constitution guarantees[.]" *Id.* at 611 (citations, alterations, and internal quotation marks omitted). "The [relevant] inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (citation, alterations, and internal quotation marks omitted).

**[2]** In its analysis of the adequacy of the *Miranda* warnings, the Arizona Court of Appeals concluded that "the officers advised Doody of his *Miranda* rights in a clear and

understandable manner and that Doody made a knowing and intelligent waiver." *Doody*, 930 P.2d at 449.

However, the record actually reflects that the detective's administering of the *Miranda* warnings was far from "clear and understandable." The Arizona Court of Appeals completely failed to consider the detective's significant deviations from the printed *Miranda* form and his repeated minimizing of the warnings' significance.

During his administration of the warnings, Detective Riley emphasized that Doody should not "take them out of context," and implied to a juvenile, who had never heard of *Miranda*, that the warnings were just formalities. This misdirection was coupled with repeated assurances that the detectives did not necessarily suspect Doody of any wrongdoing. Most significantly, in informing Doody of the right to counsel, Detective Riley deviated from the form containing the juvenile *Miranda* warnings, and ad libbed that Doody had the right to counsel *if* Doody was involved in a crime. Indeed, Detective Riley instructed Doody that he had the right to counsel "if you were involved in it . . . but if you were, then that's what that would apply to[.]" The implication from this improperly qualified, unclear, and confusing warning was that Doody only had the right to counsel if he were involved in a crime. In such a circumstance, the invocation of one's right to counsel would be tantamount to admitting one's involvement in a crime. Overall, the fact that Detective Riley's explanation of a one-page *Miranda* warning form consumed twelve transcribed pages of text is a testament to the confusion generated by the detective's obfuscation. When evaluated against clearly established Supreme Court precedent, the *Miranda* warnings were constitutionally deficient. At a minimum, Doody was never clearly and reasonably informed that he had the right to counsel. *See Miranda*, 384 U.S. at 471-72 ("[A]n individual held for interrogation must be *clearly informed* that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege . . .

As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation . . . .") (emphasis added).

**[3]** The *Miranda* warnings provided to Doody were defective because Detective Riley downplayed the warnings' significance, deviated from an accurate reading of the *Miranda* waiver form, and expressly misinformed Doody regarding his right to counsel. In view of clear, convincing and contrary evidence, the Arizona Court of Appeals' conclusion that the *Miranda* warnings were "clear and understandable" constituted both an unreasonable determination of the facts and an unreasonable application of clearly established federal law. *Siebert*, 542 U.S. at 608.

Our colleagues in dissent chastise us for reaching these conclusions, accusing the majority of "once more pay[ing] mere lip service to AEDPA and then proceed[ing] as though it does not exist." *Dissenting Opinion*, p. 5860. The dissent would prefer that we simply parrot the findings made during the state court proceedings and call it a day. However, if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye.

As Justice Frankfurter recognized over sixty years ago:

> A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here

transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right . . .

*Watts v. Indiana*, 338 U.S. 49, 53-54 (1949).

The dissent strains mightily to salvage the *Miranda* warnings given in this case. Yet the inquiry is a simple one: "whether the warnings reasonably conveyed to a suspect his rights as required by *Miranda*." *Duckworth*, 492 U.S. at 203 (citation, alterations and internal quotation marks omitted). The Arizona Court of Appeals went even further, holding that the warnings "were conveyed in a clear and understandable manner." *Doody*, 930 P.2d at 449. The dissent implicitly acknowledges the error in the Arizona Court of Appeals' holding when it concedes that the warnings given were susceptible to multiple interpretations. *See Dissenting Opinion*, pp. 5869-70. It defies reason to conclude that a matter is both clear and ambiguous. Indeed, at oral argument, even counsel for the State of Arizona was hard pressed to explain what the officer's explanation meant.[3]

Our colleagues in dissent cite *Duckworth* and *California v. Prysock*, 453 U.S. 355 (1981) in support of their argument that the Arizona Court of Appeals reasonably applied *Miranda*. *See Dissenting Opinion*, pp. 5864-65. Yet, as the

---

[3]The dissent counters that two of the panel members, who are also members of the en banc panel, held that the state court "was not objectively unreasonable in concluding the *Miranda* warnings were adequate . . ." *Dissenting Opinion*, p. 5859. However, the panel opinion in no way validated the *Miranda* warnings given to Doody. *See Doody*, 548 F.3d at 862-63 (noting that the *Miranda* warnings given "did little to actually inform [Doody] of his rights."). In any event, arguments before the en banc court elucidated the unlawfulness of the warnings and the unreasonableness of the state court decision to the contrary.

dissent admits, "*Duckworth* addressed different facts from the ones before us . . ." *Id.* at 5870. *Duckworth* did not involve a juvenile defendant. The officers did not deviate from the printed form with inaccurate and garbled elaborations. There was no downplaying of the significance of the warnings. Most importantly, there was no implication that the right to counsel was available only if the individual being questioned had committed a crime. *See Duckworth*, 492 U.S. at 198-99.

Although the dissent is not as candid in its discussion of *Prysock*, that case is similarly inapposite. In *Prysock*, unlike in this case, the juvenile's parents were present. *See Prysock*, 453 U.S. at 356. As in *Duckworth*, the officer did not deviate from the written *Miranda* warnings with inaccurate and garbled elaborations. As in *Duckworth*, there was no downplaying of the significance of the *Miranda* warnings. As in *Duckworth*, there was no implication that the right to counsel was available only if the individual being questioned had committed a crime. *See Prysock*, 453 U.S. at 356-57. In sum, the best cases that can be mustered in support of the dissent's argument are readily distinguishable.[4]

The fact remains that the transcript reveals the use of *Miranda* warnings that were the very antithesis of clear. Compounding the lack of clarity was Doody's express statement to the detective that he had never heard of *Miranda* warnings. Rather than ensuring that Doody understood the warnings, the detective plowed ahead, as reflected in the following excerpt from the interrogation transcript:

---

[4]The dissent halfheartedly cites *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992), *overruled by Chavez v. Martinez*, 538 U.S. 760 (2003), as a favorable comparative to Detective Riley's downplaying of the *Miranda* warnings. *See Dissenting Opinion*, p. 5872. In *Cooper*, the officer admitted that he wanted the subject to perceive the *Miranda* warnings as a joke. *See Cooper*, 963 F.2d at 1228. However, the facts in *Cooper* are not that different. The only thing missing in this case is an admission from the detective.

Riley: Any questions?

Doody: No.

Riley: Okay. Okie dokie.

Doody: Oh yeah what's this for? (apparently referring to the *Miranda* form)

Riley: Ah, okay I'll, again, I'm gonna go in and, and explain some things to you. Ah, in the next one states that if you cannot afford an attorney, you'd have the right to have one appointed for you . . .

Doody Interrogation Transcript, Tape 1, p. 10.

Despite Doody's expressed lack of knowledge concerning the *Miranda* warnings and Doody's subsequently conveyed confusion in the question "what's this for?", Detective Riley ignored Doody's query, and moved on to the next item on his printed list.

Detective Riley injected additional confusion into the process by informing Doody that the *Miranda* warnings were for the mutual benefit of Doody and the officers. Not once, not twice, but three times Detective Riley represented to Doody that the warnings were mutually beneficial. *See* Doody Interrogation Transcript, Tape 1, p. 2. "It's only something for, for your benefit and for our benefit, okay," *see also id.* at p. 3 "[A]ll it is, is its [sic] something that's ah for your benefit, as well as four our's [sic], okay," *id.* at p. 4 "it's for your benefit, it's for your protection and for our's [sic] as well okay?" This repeated misstatement of the purpose of *Miranda* warnings carries a drastically different connotation than if the detective had given Doody a straight-forward explanation that the warnings were given for Doody's protection, to preserve valuable constitutional rights.

The dissent's proposition that the warnings could be construed as reinforcing that Doody was "faced with a phase of the adversary system," *Dissenting Opinion*, p. 5872, is more wishful thinking than fact. The detective's very words belie such a construction. Neither was the detective's foray a minor "deviation" from the printed warnings. Rather, the detective's garbled, rambling, inaccurate, obfuscatory advisement consumed twelve pages of transcript. Although no magic words are required, *Miranda* warnings must "clearly inform[ ]" the individual of his rights. *Miranda*, 384 U.S. at 471. The dissent's best efforts notwithstanding, the transcript speaks for itself, revealing a patent lack of clarity. The Arizona Court of Appeals' ruling to the contrary unreasonably applied *Miranda's* requirement that the warnings "clearly inform[ ]." *Miranda*, 384 U.S. at 471.

We agree with our concurring colleague that the Supreme Court's decision in *Powell* does not alter the analysis or outcome of this case. *See Concurring Opinion*, p. 5847. Indeed, our dissenting colleagues also acknowledge that *Powell* does not change the way this case should be analyzed. *See Dissenting Opinion*, p. 5866.

In *Powell*, the *Miranda* warning form consisted of the following text:

> You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.

130 S. Ct. at 1200 (citations omitted).

**[4]** The warning in *Powell* was read verbatim, with no elaboration. The latter fact appears to have been important to

the Supreme Court's determination that the warning was consistent with the *Miranda* requirements. In discussing its ruling in *Prysock*, the Supreme Court explained that it upheld the *Miranda* warnings in that case because "nothing in the warnings . . . suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general . . . *Id.* at 1204 (citation omitted).

**[5]** Quite the opposite is true about the *Miranda* warnings given to Doody. In the midst of giving Doody his warnings, Detective Riley expressly and affirmatively limited those warnings by informing Doody that he was only entitled to counsel if he was involved in a crime. In addition, as discussed above, Detective Riley repeatedly minimized the importance of the *Miranda* warnings, deviated from an accurate reading of the printed form and obfuscated the meaning of the warnings. Because the facts of this case differ so markedly from those in *Powell*, we continue in our view that the *Miranda* warnings provided to Doody did not clearly convey his rights to an attorney, and that the Arizona Court of Appeals unreasonably applied *Miranda* in ruling to the contrary.

Our colleagues in dissent recite the well-established requirement that "an accused must be 'clearly informed' of his rights" prior to interrogation. *Dissenting Opinion*, p. 5860 (quoting *Miranda*, 384 U.S. at 471). Yet, in the immediately following pages, the dissent strains to justify the *Miranda* warnings given to Doody that came nowhere close to meeting the *Miranda* standard mandating clarity.

Simply stating that something is so does not make it so. Indeed, no amount of repetition can change the fact that the downplayed, obfuscated, garbled warnings given to Doody ran afoul of the clarity mandated by *Miranda*. Detective Riley's twelve-page "explanation" of a simple one-page form was the very antithesis of clarity. The officers in *Powell* administered the standard *Miranda* warnings from a form

with no elaboration. *See Powell*, 130 S.Ct. at 1200. The form failed to explicitly inform the suspect that the right to counsel existed during questioning as well as before questioning. *See id.* at 1205. In contrast, Detective Riley went beyond administering the standard form, consuming twelve transcribed pages in minimizing the importance of the *Miranda* warnings and affirmatively advising Doody that he had a right to counsel *if* he was involved in a crime.

Our dissenting colleagues seek Supreme Court authority that would have guided the Arizona Court of Appeals to the conclusion that Detective Riley's *Miranda* delivery impermissibly downplayed the significance of the warnings. *See Dissenting Opinion*, pp. 5871-72. To be sure, the Arizona Court of Appeals need only have referred to *Miranda* itself. In *Miranda*, the Supreme Court clearly established the basic protection that "an individual held for interrogation must be *clearly informed* that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . ." *Miranda*, 384 U.S. at 471 (emphasis added). The Supreme Court articulated the reasoning underlying the need for such warnings:

> We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be *adequately* and *effectively* apprised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467 (emphases added). Given the Supreme Court's articulation of the vital nature of *Miranda* warnings, it is inconceivable that *Miranda* stands for the dissent's proffered

proposition that a police officer may misstate the right to counsel and denigrate the importance of the very protections for which *Miranda* provides. Logic dictates otherwise. *See id.* at 476 ("The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.").

Our colleagues in dissent accuse us of ignoring the "binding constitutional concept" of "comity." *Dissenting Opinion*, p. 5868. However, comity does not command abdication. Rather, as Article III judges, we have a responsibility to grant habeas relief if Supreme Court precedent has been unreasonably applied. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court *can disagree* with a state court's . . . determination and, when guided by AEDPA, conclude the decision was unreasonable. . .") (emphasis added).

The dissent quotes liberally from the Supreme Court's recent decision in *Harrington v. Richter*, 131 S. Ct. 770 (2011) to emphasize the high standard governing habeas review. *See, e.g.*, *Dissenting Opinion* at pp. 5868. The majority does not quarrel with that standard. Indeed, this court has frequently applied that standard to deny habeas relief. *See, e.g.*, *McNeal v. Adams*, 623 F.3d 1283, 1287-88 (9th Cir. 2010); *Norris v. Morgan*, 622 F.3d 1276, 1287-88 (9th Cir. 2010); *McCormick v. Adams*, 621 F.3d 970, 977 (9th Cir. 2010); *Cheney v. Washington*, 614 F.3d 987, 996-98 (9th Cir. 2010); *Murdoch v. Castro*, 609 F.3d 983, 995-96 (9th Cir. 2010) (en banc); *Ponce v. Felker*, 606 F.3d 596, 606 (9th Cir. 2010).

**[6]** However, when police officers interrogating a juvenile transform *Miranda's* warnings into a twelve-page rambling commentary that is in alternating part misleading and unintel-

ligible, we believe that "there is no possibility fairminded jurists could disagree," *Richter*, 131 S.Ct. at 786, that the suspect was not informed of his rights in clear terms, as *Miranda's* holding requires. *See Miranda*, 384 U.S. at 467-68 ("[I]f a person in custody is to be subjected to interrogation, he must first be informed in *clear and unequivocal* terms that he has the right to remain silent.") (emphasis added); *see also id.* at 471 ("[W]e *hold* that an individual held for interrogation must be *clearly* informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation.") (emphasis added). Thus, whatever the applicable standard for reviewing the state court decision, the violation of Doody's rights in this case is so absolutely clear as to compel that the Writ be granted.[5,6]

## B.   Voluntariness of Doody's Confession[7]

[5]We think it prudent to note that the Supreme Court expressly prefaced its ruling in *Richter* with the statement that the issue it decided was whether the standard articulated in 28 U.S.C. § 2254(d) was "adhered to . . . in this case as it relates to ineffective-assistance claims judged by the standard set forth in *Strickland* . . ." *Richter*, 131 S.Ct. at 780. In its analysis, the Supreme Court focused on the triple deference applicable — for habeas review, for the general rule articulated in *Strickland*, and for the deference to counsel's representation. *See id.* at 788. No such triple deference is applicable in a *Miranda* case, which addresses simply whether officers provided four specific warnings, as is required by the Supreme Court's clearly established precedent. Those four warnings were indisputably not given to Doody.

[6]The dissent "presumes" that *some* of the sixteen Arizona factfinders were fairminded. *Dissenting Opinion*, p. 5887-88 (emphasis added). However, if "presumed" fairmindedness were the standard, relief under AEDPA would be nonexistent. Indeed, the Supreme Court instructed in *Richter* that the standard is whether "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 131 S.Ct. at 786-87. The emphasis is clearly on application of law rather than on counting noses.

[7]Our dissenting colleagues dismiss our discussion of the voluntariness of Doody's confession as gratuitous. *See Dissenting Opinion*, p. 5873. To

**[7]** In determining the voluntariness of a confession, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation and internal quotation marks omitted). "The due process test takes into consideration the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." *Id.* (citations and internal quotation marks omitted). It is not sufficient for a court to consider the circumstances in isolation. Instead, "all the circumstances attendant upon the confession must be taken into account." *Reck v. Pate*, 367 U.S. 433, 440 (1961) (citations omitted).

**[8]** As the Supreme Court has observed, "[t]he application of these principles involves *close scrutiny* of the facts of individual cases." *Gallegos v. Colorado*, 370 U.S. 49, 52 (1962) (emphasis added). "The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn." *Id.* (citations omitted). An additional relevant factor is "the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *Withrow*, 507 U.S. at 693-94 (citations omitted). Thus, we ask: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (citation omitted).

---

the contrary, voluntariness is a separate and independent ground for reversal of the Arizona Court of Appeals' ruling, although the voluntariness argument also provides additional support for our conclusion regarding the inadequacy of the *Miranda* warnings Doody received. *See Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (discussing the interrelatedness of the voluntariness and *Miranda* inquiries).

**[9]** The fact that Doody was a juvenile is of critical importance in determining the voluntariness of his confession. The Supreme Court "has emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967). In *Haley v. Ohio*, 332 U.S. 596, 599-600 (1948), the Supreme Court observed:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child-an easy victim of the law-is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest.

Although *Haley* involved a fifteen-year old juvenile, the principles underlying the Supreme Court's observation apply equally to Doody's circumstances given the intensity of his interrogation and his isolation during twelve-plus sleep-deprived hours of continuous questioning. *See Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) ("[A]s the Supreme Court explained in *Gallegos v. Colorado*, a teenager may not on his own be able to fully appreciate what is at stake when the police seek to question him[.]").

**[10]** The audiotapes of Doody's interrogation are dispositive in this case, as we are not consigned to an evaluation of a cold record, or limited to reliance on the detectives' testimony. We can readily discern from the audiotapes an extraor-

dinarily lengthy interrogation of a sleep-deprived and unresponsive juvenile under relentless questioning for nearly thirteen hours by a tag team of detectives, without the presence of an attorney, and without the protections of proper *Miranda* warnings. The intensive and lengthy questioning was compounded by Doody's lack of prior involvement in the criminal justice system, his lack of familiarity with the concept of *Miranda* warnings, and the staging of his questioning in a straight-back chair, without even a table to lean on. None of these considerations were even mentioned by the Arizona Court of Appeals.

The dissent denigrates the majority for, in its view, "attempt[ing] to paint Doody as a tender youth, lacking intellect or sophistication, younger than his chronological age of seventeen-and one-half years." *Dissenting Opinion*, p. 5874. However, it is not the majority that has set the standard for considering the juvenile status of a subject. The Supreme Court has consistently reminded us that "admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. at 45; *see also Haley*, 332 U.S. at 599-600; *Gallegos*, 370 U.S. at 53 (noting that a teenager may not be fully appreciative of the high stakes involved when "questioned through the dead of night by relays of police"). More importantly, the facts, as supported by the record in this case, reveal that Doody was indeed an unsophisticated teenager.

As recently as 2005, the Supreme Court reminded us of the special concern with which we should approach issues involving "juveniles under 18." The Supreme Court declared that "as any parent knows and as the scientific and sociological studies . . . tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations, alteration, and internal quotation marks omitted). "In recognition of the comparative immaturity and

irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent." *Id.* (citation omitted).

Apparently, the State of Arizona holds a similar view of the inability of juveniles to fully appreciate the magnitude of various and sundry life experiences. *See Porter v. Triad of Ariz.*, 52 P.3d 799, 802 (Ariz. Ct. App. 2002) ("[I]n Arizona, a minor is never allowed to bring an action in his own name but must always sue through a representative whatever the cause of action.") (citation omitted); *First Nat'l Bank of Ariz. v. Taylor*, 426 P.2d 663, 666 (Ariz. Ct. App. 1967) ("[M]inor beneficiaries cannot consent to the termination of a trust for their benefit.") (citations omitted); A.R.S. § 4-101 (18) (establishing the "legal drinking age" as "twenty-one years of age or older"); A.R.S. § 28-3320 (A)(5) (providing for suspension of driver's license of individual "under eighteen years of age" for possessing or purchasing materials "used for graffiti"); A.R.S. § 5-504 (B)(5) (prohibiting individuals under eighteen years of age from selling lottery tickets); A.R.S. § 5-515.02 (prohibiting individuals under twenty-one years of age from purchasing lottery tickets); A.R.S. § 5-601.02 (w)(1) (prohibiting persons under twenty-one years of age from gambling); A.R.S. § 8-101 (4) (defining "child" as "any person under eighteen years of age"); A.R.S. § 9-500.26 (regulating entry from Arizona into Mexico "by any resident . . . who is under eighteen years of age"); A.R.S. § 13-3111 (prohibiting minors under eighteen years of age from possessing firearms); A.R.S. § 13-3403 (A)(2) (prohibiting sale or transfer of "a vapor-release substance containing a toxic substance to a person under eighteen years of age."); A.R.S. § 13-3403.01 (A) (prohibiting the sale or delivery of a container containing nitrous oxide "to a person under eighteen years of age"); A.R.S. § 13-3513 (prohibiting sale or distribution in vending machines of materials harmful to individuals under the age of eighteen); A.R.S. § 13-3721 (A)(1) (prohibiting tattooing or body piercing "of a person who is under eighteen years of age without the physical presence of the parent or legal guardian . . .");

A.R.S. § 15-805 (B)(1) (requiring presence of parent or person having custody when a citation for not attending school "is issued to a child under eighteen years of age"); A.R.S. § 17-362 (A) (prohibiting any person "under eighteen years of age" from serving as a licensed guide); A.R.S. § 23-231 (prohibiting persons under the age of eighteen from being employed in certain occupations unless a variance is obtained); A.R.S. § 25-102 (A) (providing that "[p]ersons under eighteen years of age shall not marry without the consent of the parent or guardian having custody of such person"); A.R.S. § 28-1555 (A) ("A court shall not dispose of a moving traffic violation charge arising from the issuance of a traffic citation to a juvenile under eighteen years of age unless a parent or guardian of the juvenile appears in court with the juvenile at the time of the disposition of the charge."); A.R.S. § 32-558 (requiring private schools to enter into a contract with students, and providing that "[a] contract between a school and a student shall bear the signature of a school official and the student or parent or guardian if the student is under eighteen years of age"); A.R.S. 36-798.01 (limiting access of persons under eighteen to tobacco products); A.R.S. § 44-1602 (H) ("A dealer shall not purchase any precious item from any person under eighteen years of age unless the person is accompanied by a parent or guardian who must submit identification . . ."); A.R.S. § 11-251(40) (permitting board of supervisors to impose curfew on minors); A.R.S. § 28-3151, Op. Atty. Gen. No. 67-25-L (providing that a chauffeur's license cannot be issued to a person under eighteen years of age); A.R.S. § 36-333.03 (A) (requiring parent or legal guardian of a person under eighteen years of age to petition court to establish minor's date of birth, place of birth, and parentage); A.R.S. § 36-673 (D) ("A minor child [under eighteen years of age] shall not be immunized without the informed consent of the parent, guardian or person in loco parentis of the child . . .").

In sum, under the law, and as a matter of fact and common knowledge, Doody's participation in ROTC, his not-yet-

completed high school studies, his work as a grocery store bagger, his ability to speak English as a second language and his lack of mental disability in no way lessen the Supreme Court's instruction regarding the special caution with which we review a confession extracted from a teenager.

The dissent makes the same mistake the Arizona Court of Appeals made — ticking off the list of circumstances rather than actually considering them in their totality. Lest the dissent remain "confounded" by this unremarkable conclusion, *Dissenting Opinion*, p. 5886, we liken the Court of Appeals' superficial approach to the listing of a number of mental conditions without explaining how and the extent to which those conditions affect an individual's ability to reason. *See, e.g.*, *Earp v. Ornoski*, 431 F.3d 1158, 1178 (9th Cir. 2005), *as amended* (noting the expert's conclusion of the nature of the mental impairment *and* how that impairment affected the individual). The Court of Appeals' approach is also similar to the state court analysis we criticized in *Barker v. Fleming*, 423 F.3d 1085 (9th Cir. 2005), where we noted the "crucial" requirement from the Supreme Court of a cumulative assessment when determining the materiality of *Brady* evidence. *Id.* at 1094. We observed that "the Washington Supreme Court did not conduct [a cumulative] analysis. Instead, the court separately analyzed the . . . evidence . . . on a piece-meal basis and then ended its analysis." *Id.* Likewise, the Arizona Court of Appeals listed the circumstances of Doody's interrogation separately "on a piece-meal basis and then ended its analysis." *Id.*

Most disturbing is the dissent's reliance on the Arizona Court of Appeals' justification that "[t]he detectives allowed Doody to take bathroom breaks and offered him food and drinks throughout the interrogation." *Dissenting Opinion*, p. 5875. Never mind that the first break was over nine hours into the interrogation, after Doody's will was overborne. That fact was not discussed at all by the Arizona Court of Appeals. The court also completely ignored the fact that Doody was not a

native of this country, other than to note that his English was "lightly accented." *See Doody*, 940 P.2d at 445. The court never even mentioned the number of officers involved in the interrogation, the tag team approach used, or the false confessions that the same police task force had extracted previously from the Tuscon suspects.[8] Doody's statements were simply not voluntary given the totality of the circumstances. For the most part, Doody was virtually non-responsive despite being peppered with a barrage of questions, exhortations, and commands. This pattern recurred throughout the interrogation.

The Arizona Court of Appeals' ruling was also premised on an unreasonable determination of several pivotal facts. For example, the Arizona Court of Appeals held that "[e]ach of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers' testimony." *Id.* at 446. The court of appeals also determined that "[t]he record, both at the time of the suppression hearing and after trial, includes *no evidence* that calls into question the testimony that Doody remained alert and responsive." *Id.* (emphasis added). However, review of the audiotapes reveals a completely different scenario. During the relentless questioning by the detectives, Doody was anything but "responsive." In fact, the detectives utilized relentless interrogation tactics precisely because Doody remained unresponsive and did not provide the answers they sought. At

---

[8]The dissent concedes that "the state court did not describe the physical surroundings" of the interrogation. *Dissenting Opinion*, p. 5877 n.7. In an effort to fill this void, the dissent describes the physical surroundings as "what had been the office of a Maricopa County attorney, roughly ten feet by eighteen feet in size, well-lit, with carpeted floors and padded chairs . . ." *Id.* The dissent completely fails to mention that the chair where Doody was seated had a straight, immobile back. There was no table or desk on which Doody could lean or rest his head. For almost thirteen hours, Doody was required to sit completely upright while being interrogated by a tag team of officers.

approximately 3:00 a.m., the three officers bombarded Doody with questions in the face of almost complete silence from Doody. They asked him five times who devised the plan to go to the temple. Doody did not answer. They inquired fourteen times whether Caratachea came up with the idea. Doody responded only once — that he did not know. They asked twenty-five times whether Doody was present at the temple. Doody was silent. During this sequence, lasting approximately twenty minutes, Doody answered one out of forty-five questions. That is a far cry from responsive. Indeed, at one point Doody was admonished to "stop freezing up."

The next series of questions addressed whether Doody's failure to respond was due to threats from someone. As an initial matter, we note that this line of questioning completely undermines the detectives' testimony and the Court of Appeals' conclusion that Doody was responsive. If Doody were indeed responsive, there would be no need to question him regarding why he was not responding. Doody responded to a few of these questions, but again fell silent when the detectives inquired seven times about whose idea it was to go to the temple. Doody remained silent for eight minutes in the face of thirty questions in a row. Doody only broke his silence when Detective Sinsabaugh asked him nine times whether he remembered the detective's name. Doody's answers to these questions from Detective Sinsabaugh were barely audible.

The suppression hearing testimony confirms that Doody was not "alert and responsive." Although Detective Riley testified that Doody was alert, this was not the full extent of his suppression hearing testimony. Detective Riley confirmed that there were extended periods during the interrogation when Doody remained unresponsive, when Doody's posture "deteriorated," and when Doody looked down at the ground for long periods of time. Detective Riley also acknowledged that there were several pages of transcript reflecting that Doody did not respond to his continuous questioning.

**[11]** In view of the fact that we are considering the questioning of a sleep-deprived juvenile subjected to nearly thirteen hours of uninterrupted interrogation, the degree of Doody's responsiveness is a pivotal concern. The audiotapes reveal that the Arizona Court of Appeals' factual determination that there was no evidence indicating Doody's non-responsiveness was "rebutted by clear and convincing evidence." *Gonzalez*, 341 F.3d at 903 (citations omitted); *see also Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision."). Indeed, the Arizona Court of Appeals acknowledged that "Doody did not speak for long periods during the interrogation." *Doody*, 930 P.2d at 447. This acknowledgment directly contravenes the conclusion that Doody was responsive.

The dissent concedes, as it must, that "Doody *did not speak for long periods during the interrogation*." *Dissenting Opinion*, p. 5883 (quoting *Doody*, 930 P.2d at 447) (emphasis added). Yet, in a heroic effort to rehabilitate the unreasonable factual finding that Doody was nevertheless alert and responsive, the dissent relies on "visual clues" to contradict the tale of the silent audiotapes. *Id.* The dissent's leap in logic completely fails to account for the officers' continuous badgering of Doody for his failure to respond. If he were in fact responding, why would the detectives repeatedly question him regarding his lack of response and urge him to reply? More importantly, the dissent completely ignores Detective Riley's testimony describing the "visual clues" of how Doody's "posture began to deteriorate. His attentiveness also deteriorated. And his eye contact dropped to where he would look at the ground for long periods of time . . ." Even assuming that there was equivocal evidence of responsiveness, the Arizona Court of Appeals' finding that *no evidence* supported Doody's claim was unreasonable.

The Arizona Court of Appeals also concluded that "the audio tapes reveal a courteous, almost pleading style of ques-

tioning during most of the interview." *Doody*, 930 P.2d at 446. To the contrary, the audiotapes demonstrate that the detectives' relentless and uninterrupted interrogation of an unresponsive juvenile was far from "courteous." Instead, the detectives continuously demanded, over and over without a response from Doody, answers to their questions. The detectives' unyielding demands for answers clearly rebut the Arizona Court of Appeals' determination regarding the interrogation's tone and convince us that Doody's confession was not "the product of an essentially free and unconstrained choice." *See Schneckloth*, 412 U.S. at 225-26. Although the detectives sometimes couched their questions in "pleading" language, their tones were far from pleasant, varying from "pleading" to scolding to sarcastic to demeaning to demanding. Regardless of tone, over twelve hours of insistent questioning of a juvenile by tag teams of two, three and four detectives became menacing and coercive rather than "courteous." Tellingly, some of the detectives' statements, particularly those immediately preceding the confession, informed Doody that he *had* to answer their questions. Any doubt regarding the unreasonableness of the state court's factual determination is easily resolved by listening to the audiotapes. Indeed, at times the tones of the detectives are downright chilling.

Let us not forget that this same task force questioned four adult men and, undoubtedly using the same tactics, procured what the State concedes were false confessions from all four. That the will of four adult men was overborne to the extent that they confessed to murders they did not commit further persuades us that the will of this young teen was similarly overborne. And that is the real elephant in the room, an elephant that both the Arizona Court of Appeals and the dissent studiously ignore — the undisputed evidence in the record that this same task force, undoubtedly using the same "courteous, almost pleading style of questioning" extracted false confessions from four adults for the same crime with which

Doody was charged. Is there any doubt that the wills of those individuals were overborne?[9]

**[12]** The existence of the false confessions, careful analysis of the interrogation tapes and due consideration of the totality of the circumstances foreclose an intellectually honest conclusion that the finding of voluntariness was reasonable.

The portions of the interrogation tapes quoted above may appear lengthy. However, they are literally just snippets of the entire interrogation, which consumed seventeen tapes.[10] These quotes are excerpts from only two of the tapes, and they are included as a sketch of the actual interrogation. They reveal a picture that bears no resemblance to the avuncular scene painted by the Arizona Court of Appeals. The Arizona Court of Appeals unreasonably minimized the length of Doody's interrogation, an important factor in the voluntariness analysis. *See Gallegos*, 370 U.S. at 52. The Arizona Court of Appeals determined that Doody confessed voluntarily because, "[a]lthough the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea's rifle at the time of the temple murders after approximately two and one-half hours of questioning." *Doody*, 930 P.2d at 446. Not so. While admitting that he and Garcia borrowed the rifle, Doody identified the time frame as "close to the end of June," more than a month before the murders. Doody Interrogation Transcript, Tape #3, p. 30. Therefore, contrary to the finding of the Arizona Court of Appeals, Doody decidedly did *not* admit to involvement in the temple murders after two and one-half hours of questioning. Indeed, as reflected in the audiotapes, Doody's admission to *any*

---

[9]Although our dissenting colleagues attempt to minimize the import of the false confessions, *see Dissenting Opinion*, p. 5885-86 n.11, they cannot deny their existence.

[10]Contrary to the dissent's implication, *see Dissenting Opinion*, p. 5887, members of the Arizona courts were not the only judges who "listened to the tapes *in toto*."

involvement occurred only after six-plus hours of intense interrogation by the detectives. The conclusion that Doody's admission occurred after two and one-half hours of questioning finds no support in the record.

Our colleagues in dissent reason that, "although the interview lasted nearly thirteen hours, Doody made an inculpatory statement after about two and one-half hours by admitting to borrowing the murder weapon . . ." *Dissenting Opinion*, pp. 5874. The dissent later clarifies that the Arizona Court of Appeals' finding that "Doody admitted he had borrowed Caratachea's rifle *at the time of the temple murders*" was a reasonable factual finding. *Dissenting Opinion*, p. 5886 (citing *Doody*, 930 P.2d at 446) (emphasis added). In fact, Doody admitted to borrowing the rifle more than thirty days before the murder. A finding that Doody admitted possessing the murder weapon *at the time of the crime* is patently unreasonable when the admission actually addressed a time period substantially in advance of the date of the crime. The dissent resorts to name-calling, accusing the majority of being "disingenuous" and "re-writ[ing] the state court's findings in order to declare them patently unreasonable." *Dissenting Opinion*, p. 5886 (internal quotation marks omitted). However, there is no need to re-write the state court's finding on this point. No amount of sugarcoating can obscure the fact that the state court unreasonably found that Doody admitted possessing the murder weapon at the time of the murders when he made no such admission.

There is also no record support for the Court of Appeals' trivializing of the hours of interrogation after Doody's admission that he was involved in the events at the temple. The audiotapes reveal that the detectives continued to use the same interrogation techniques after Doody's one-word admission. The detectives continued to pressure Doody for details

concerning the events at the temple. By the end of the interrogation, Doody was sobbing almost hysterically.[11]

[13] The prosecution used the details of his confession against Doody during trial to corroborate the testimonies of the prosecution's key witnesses. The hours of interrogation subsequent to Doody's confession to being present at the temple, therefore, were of critical importance to the case against Doody. The Arizona Court of Appeals' contrary determination was objectively unreasonable. *See Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) ("[F]ailure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding.") (citation omitted).

[14] Finally, the Arizona Court of Appeals' voluntariness ruling unreasonably applied clearly established federal law because it analyzed the individual circumstances of the interrogation without weighing the totality of the circumstances. As discussed above, the Arizona Court of Appeals failed to consider "whether [Doody's] will was overborne by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434 (citation and internal quotation marks omitted). "The determination depends upon a *weighing* of the circumstances of pressure against the power of resistance of the person confessing." *Id.* (citation, alteration, and internal quotation marks omitted) (emphasis added).

[15] Rather than weighing all the circumstances, the Arizona Court of Appeals dismissed each relevant fact seriatim without considering whether Doody's juvenile will was overborne by the relentless questioning of a tag team of detectives over the course of an interrogation that lasted, virtually without interruption and despite Doody's non-responsiveness,

---

[11]This tale of the tape completely refutes the dissent's characterization of Doody as "almost chatty in the last several hours of the interrogation." *Dissenting Opinion*, p. 5883 n.10.

from approximately 9:30 p.m. until 10:00 a.m. As noted above, the Arizona Court of Appeals failed to consider in totality circumstances including Doody's youth, his lack of prior involvement with the criminal justice system, his lack of familiarity with *Miranda* warnings, his non-native status, the length of the interrogation with Doody seated in a straight-back chair for over nine hours without a break, the lack of adequate *Miranda* warnings, the tag team tactics used by the detectives, the number of interrogators, Doody's persistent non-responsiveness, and the previous false confessions. We recognize that the Arizona Court of Appeals determined that the *Miranda* warnings were "clear and understandable," *Doody*, 930 P.2d at 449, thereby explaining its failure to weigh that particular aspect of the interrogation. However, no apparent justification can be discerned for the failure to actually weigh, rather than simply list, the other factors that have been delineated for consideration by the United States Supreme Court. This failure of the Arizona Court of Appeals was an unreasonable application of established authority requiring consideration of the total circumstances surrounding the interrogation, and it renders the conclusion of voluntariness infirm. *See Reck*, 367 U.S. at 440-42 (addressing the "combination of circumstances"); *see also Gallegos*, 370 U.S. at 52 (condemning interrogators "serving in relays").

In determining the voluntariness of a confession, "[t]he due process test takes into consideration the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. . . . The determination depends upon a *weighing* of the circumstances of pressure against the power of resistance of the person confessing." *Dickerson*, 530 U.S. at 434 (citations, alterations, and internal quotation marks omitted) (emphasis added). The required weighing of the circumstances was not performed by the state court.

The dissent's argument notwithstanding, the jury's voluntariness determination is not dispositive. In *Jackson v. Denno*, 378 U.S. 368, 390 (1964), the Supreme Court explained:

Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne-facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence.

*Id.* at 390 (citations omitted). Applying *Jackson*, the Arizona Court of Appeals has emphasized the importance of the trial court's duty to exclude involuntary confessions, irrespective of the jury's finding. *See State v. Strayhand*, 911 P.2d 577, 589 n.3 (Ariz. Ct. App. 1995) ("The dissent says that even if the confessions should not have been admitted, no fundamental error occurred because the jury found that they were voluntary. The proper procedure for weighing voluntariness is set out in [*Jackson*]. The threshold voluntariness inquiry is for the court and the defendant can reargue the matter to the jury. Considering *Jackson* . . . it is clear that *when it appears at any stage of the proceedings that a confession is involuntary, it is the trial judge's duty to exclude it from evidence*.") (emphasis added).

Our dissenting colleagues implicitly condemn Doody for not testifying at the voluntariness hearing. *See Dissenting Opinion*, p. 5857. However, as the Arizona state courts have held, Doody's failure to testify does not preclude relief. *See Strayhand*, 911 P.2d at 589 n.3 ("The fact that the Defendant did not testify at the voluntariness hearing does not mean that he is not entitled to relief now.").

Relying on *Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005), and *United States v. Doe*, 155 F.3d 1070 (9th Cir. 1998) (en

banc), the dissent also maintains that "[w]e have repeatedly held a suspect's minor age and the absence of a parent do not make a confession presumptively involuntary." *Dissenting Opinion*, p. 5878. Besides the fact that the majority opinion never applies any presumption of involuntariness, the cited cases are readily distinguishable. In *Juan H.*, the defendant was properly informed of his *Miranda* rights, and never made any incriminating statements. *See Juan H.*, 408 F.3d at 1272-73. Accordingly, no credible claim of involuntariness could be made. *See id.*

*Doe* is similarly inapposite. In that case, we noted that "there [was] no indication that the questioning was oppressive in any way." *Doe*, 155 F.3d at 1075. Such was not the case with Doody. Indeed, the dissent concedes that the police "engag[ed] in a variety of psychologically coercive interrogating tactics." *Dissenting Opinion*, p. 5880.

The amalgamated citations to *Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003), *Jenner v. Smith*, 982 F.2d 329 (8th Cir. 1993), *United States v. Lehman*, 468 F.2d 93 (7th Cir. 1972), and *United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003), *see Dissenting Opinion*, p. 5878, are no more persuasive, as none of these cases involved a juvenile, or lengthy middle-of-the-night questioning. *See Clark*, 331 F.3d at 1072 (questioning of an adult for five hours); *Jenner*, 982 F.2d at 333-34 (questioning of an adult for seven hours); *Haswood*, 350 F.3d at 1027-28 (questioning of an adult for an undetermined amount of time that was inferred to be "all day").

It is unclear why the dissent cites to *Lehman*. In that case, a dentist was questioned in his office, and the Seventh Circuit observed:

> Although Lehman maintains that he felt confined and watched in his own small private office and that his will was eventually overcome by the agents' method of questioning, he found time during this

period of alleged virtual confinement to discuss his academic achievements and to recommend to one of the agents what should be done for the treatment of emphysema. Lehman was in his own suite and not in custody and could have cut off the interview at any time. He was found to be a man of intelligence, education and maturity. He was apprised of his questioners' mission with regard to a determination of the correctness of his tax returns, and he was not completely unschooled in the implications of a tax investigation. *We further note that on at least two occasions the agents asked Lehman if he wanted to leave for his golf date.*

*Lehman*, 468 F.2d at 101 (emphasis added). The facts of that case in no way resemble the circumstances of Doody's interrogation.

The dissent also relies on cases where the Supreme Court has addressed more extreme facts involving adults. *See Dissenting Opinion*, pp. 5882-83; *see also*, *Greenwald v. Wisconsin*, 390 U.S. 519, 520-21 (1968) (interrogation of a defendant suffering from high blood pressure and deprived of sleep, food, and medication); *Darwin v. Connecticut*, 391 U.S. 346, 349 (1968) (forty-eight hour interrogation of a defendant who had been denied his right to counsel); *Beecher v. Alabama*, 389 U.S. 35, 38 (1967) (interrogation of a wounded defendant at gunpoint over five days); *Clewis v. Texas*, 386 U.S. 707, 709-10 (1967) (nine-day interrogation with inadequate food and sleep); *Davis v. North Carolina*, 384 U.S. 737, 746-47 (1966) (questioning over a sixteen-day period with inadequate food); and *Reck v. Pate*, 367 U.S. 433, 435 (1961) (mentally retarded 19-year old who became ill during the interrogation). However, the Supreme Court has never suggested, let alone held, that the interrogation of a juvenile must meet some standard of extremity to render a confession involuntary. Rather, the Supreme Court has directed that we proceed with the utmost caution when considering the confession of a juvenile,

being ever mindful of the "tender age" of the individual involved. *In re Gault*, 387 U.S. at 45.

The dissent seeks to minimize the impact of the Supreme Court's holding in *Haley*, describing this seminal case as "readily distinguishable." *Dissenting Opinion*, p. 5879.

In *Haley*, the Supreme Court set forth the following background:

> Beginning shortly after midnight this 15-year old lad was questioned by the police for about five hours. Five or six of the police questioned him in relays of one or two each. During this time no friend or counsel of the boy was present. Around 5 a.m.-after being shown alleged confessions of Lowder and Parks-the boy confessed . . .

332 U.S. at 598. Despite the absence of extreme facts, the Supreme Court concluded:

> The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights *combine* to convince us that this was a confession wrung from a child by means which the law should not sanction . . .

*Id.* at 600-01 (emphasis added).

The dissent does not even mention the operative facts regarding the actual interrogation in *Haley*:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child -an easy victim of the law-is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for

a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning. A photographer was admitted once this lad broke and confessed. But not even a gesture towards getting a lawyer for him was ever made.

*Haley*, 332 U.S. at 599-600. The dissent skips over these facts in favor of several facts in *Haley* that occurred *after* the interrogation. *See Dissenting Opinion*, p. 5879. However, in the paragraph immediately following the Supreme Court's description of the actual interrogation, the Supreme Court observed:

This disregard of the standards of decency is underlined by the fact that he was kept incommunicado for over three days during which the lawyer retained to represent him twice tried to see him and twice was refused admission. A photographer was

admitted at once; but his closest friend-his mother-was not allowed to see him for over five days after his arrest. It is said that these events are not germane to the present problem because they happened *after* the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year old boy behind closed doors in the dead of night becomes darkly suspicious.

*Haley*, 332 U.S. at 600 (emphasis added). In the next paragraph, the Supreme Court applied the relevant totality of the circumstances standard:

The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights *combine* to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.

*Id.* at 600-01 (emphasis added). *Haley*, therefore, is not "readily distinguishable." *Dissenting Opinion*, p. 5879. Indeed, the facts of *Haley* are much more analogous to the circumstances faced by Doody than are the cases cited by the dissent in support of its argument.

The dissent also cites to *United States ex rel. Hayward v. Johnson*, 508 F.2d 322 (3d Cir. 1975), *Rogers v. Quarterman*,

555 F.3d 483 (5th Cir. 2009), *Jackson v. McKee*, 525 F.3d 430 (6th Cir. 2008), and *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002), for the proposition that other circuits have also readily distinguished *Haley*. *See Dissenting Opinion*, p. 5880 n.9. A close examination of these cases reflects why they distinguished *Haley*, and in no way support the Arizona Court of Appeals' ruling.

In *Hayward*, the seventeen-year old defendant "was questioned on three separate occasions . . . each time in a small interrogation room at the police station and each time after receiving the full Miranda warnings. . . . [H]e went voluntarily and with his mother's permission each time he was questioned." 508 F.2d at 324. The Third Circuit observed:

> [W]e are troubled by the police conduct here, involving a late night questioning, without any apparent justification, of a seventeen-year old youth. We also acknowledge that the Supreme Court's decision in [*Haley*], on which appellant relies, is in some respects similar to the case before us. In that case, the Supreme Court held involuntary the confession of a fifteen-year old boy who was taken from his home at night and questioned steadily from 12:00 midnight to 5:00 a.m.

*Id.* at 326.

However, the Third Circuit relied on the fact that the appellant never challenged the adequacy of the *Miranda* warnings to distinguish *Hayward* from *Haley*. *See id.* at 327. The Third Circuit also noted that:

> *the period of questioning was shorter and the manner of questioning seems less coercive.* Unlike the youth in [*Haley*], who gave his confession only after five hours of continuous incommunicado questioning by five or six policemen in relays of one or two

each, *appellant here began to give his confession
early on the third occasion he was questioned, and
the questioning was conducted predominantly by one
person, Detective Kelly.*

Furthermore, *the confession was obtained only on
the third occasion he was questioned. By October 3,
the circumstances of his questioning and the setting
at the police station must have appeared less novel
and intimidating; after two previous questionings he
had been sent home, where he had the opportunity,
unpressured by the police, to consider his situation;
he was fully informed that the police were investigat-
ing his possible role in the death of William Smith;
and he was surely aware that the police had twice
released him without obtaining a confession.* There-
fore, since he had been subjected to unfamiliar sur-
roundings on two prior occasions and yet had
withstood lengthy questionings without confessing,
we find it difficult to conclude that he was not acting
voluntarily on October 3, when he began giving his
oral incriminatory statement shortly after arriving
and completed giving it within *an hour and fifteen
minutes of questioning.* Finally, *unlike the Supreme
Court in Haley, we, find no evidence of a callous dis-
regard of appellant's rights by the police after he
gave his confession which might cast suspicion on
their conduct throughout the questioning.*

*Id.* at 327 (citation and footnote references omitted) (empha-
ses added). Contrary to the dissent's assertion, the Third Cir-
cuit did not distinguish *Haley* simply because the "suspect
was informed of his right to remain silent." *Dissenting Opin-
ion*, p. 5880 n.9 (internal quotation marks omitted).

In *Rogers*, 555 F.3d at 485, after being informed of his
rights by a magistrate, the defendant

was then taken to an interview room and left alone for a short amount of time. He was offered a soda. He was then interrogated by the officers for *three to five minutes*. During this time, Rogers claimed he was innocent. Anderson became frustrated and told Rogers to stop lying because his prints had been found at the crime scene. Rogers began to tear up, so he was asked if he would like to speak with a particular officer about the offense. Rogers chose Douglas, so Miller and Anderson left the room. *After 30-35 minutes, Douglas exited the interview room and stated that Rogers had confessed.*

*Id.* at 485 (emphasis added). In distinguishing *Haley*, the Fifth Circuit opined:

*Rogers was not continuously or lengthily interrogated . . .* Most significantly, *he was not subjected to physical abuse, mental coercion, trickery, or deceit . . .* The officers were truthful when they represented to Rogers that his fingerprints had been found at the scene, and *there is no evidence that the officers somehow induced Rogers's confession.* Moreover, *Rogers was afforded the full, extensive protections of section 51.09 of the Texas Family Code.*[12]

*Id.* at 495 (emphases added). The safeguards present in *Rogers* were not available in *Haley* or to Doody.

---

[12]Texas Family Code § 51.06 provided:

Unless a contrary intent clearly appears elsewhere in this title, any right granted to a child by this title or by the constitution or laws of this state or the United States may be waived in proceedings under this title if: (1) the waiver is made by the child and the attorney for the child; (2) the child and the attorney waiving the right are informed of and understand the right and the possible consequences of waiving it; (3) the waiver is voluntary; and (4) the waiver is made in writing or in court proceedings that are recorded.

In *Jackson*, the seventeen-year old defendant was interrogated on several occasions. The Sixth Circuit distinguished *Haley* :

> *Jackson, by contrast* [to *Haley*]*, was older (17 years old); he was questioned intermittently, not continuously; he was told repeatedly of his rights to counsel and to remain silent; and no evidence shows that the officers took a callous attitude toward his rights . . .*

*Jackson*, 525 F.3d at 435 (citations omitted) (emphasis added). Because the defendant "was questioned intermittently, not continuously," "told repeatedly of his rights to counsel and to remain silent," and "[t]he officers' questioning . . . never exceeded two and a half hours at a time," it is not surprising that the Sixth Circuit did not fault the state court for "declining to extend [*Haley*]" to the facts. *Id.* at 434-35. Contrary to the dissent's characterization, the Sixth Circuit, therefore, did not distinguish *Haley* only on the basis that the "suspect, by contrast, was older (17 years old)." *Dissenting Opinion*, p. 5880 n.9.

Finally, in *Hardaway*, the Seventh Circuit noted:

> Hardaway's case is less egregious [than Haley's], in that there were no efforts to keep his parents away or to confront him with false testimony, and he was held for less than one day rather than three.[13] *There were also lengthy breaks in the interrogations,*

---

[13]Although the dissent relies on this statement that the defendant "was held for less than one day rather than three," to distinguish *Haley* from *Doody*, *Dissenting Opinion*, p. 5880 n.9, it is important to remember that the holding of Haley for three days occurred *after* his interrogation. *See Haley*, 332 U.S. at 600. It is unclear why the dissent implies that three days in custody is somehow a temporal benchmark for whether a confession is involuntary, particularly as the Supreme Court emphasized that Haley was "questioned through the dead of night by relays of police . . . from midnight to 5 a.m." *Id.* at 599.

> *rather than the five grueling hours that Haley was*
> *forced to endure.*

*Hardaway*, 302 F.3d at 763 (citations, alteration, and internal quotation marks omitted). Contrary to the dissent, the Seventh Circuit did not simply distinguish *Haley* because "the suspect was held for less than one day rather than three." *Dissenting Opinion*, p. 5880 n.9 (internal quotation marks omitted).

Simply put, the dissent's attempt to distinguish *Haley* by relying on inapposite cases from other circuits fails miserably.

The deference AEDPA requires we give to factual findings and legal conclusions from state courts does not and cannot equate to abdication of our judicial responsibilities. *See Taylor*, 366 F.3d at 1008 ("In passing section 2254(d)(2), Congress has reminded us that we may no more uphold such a factual determination than we may set aside reasonable state-court fact-finding. When we determine that state-court fact-finding is unreasonable, therefore, we have an obligation to set those findings aside and, if necessary, make new findings."). We recognize and acknowledge that police officers are entitled to use, and do use, a variety of techniques to interrogate suspects. However, when those techniques overbear the will of the suspect in contravention of his constitutional rights, any confession obtained through the overbearance must be suppressed. *See DeWeaver*, 556 F.3d at 1002-03 ("A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary.") (citation omitted).

With the utmost respect to our concurring colleague, we do not view our opinion as an exercise in "yarn-spinning." *See Concurring Opinion*, p. 5843. Rather, we address the Arizona Court of Appeals' unreasonable determinations, including that there was "*no evidence* that calls into question the testimony that Doody remained alert and responsive." *Doody*, 530 P.2d at 446 (emphasis added). To uphold this determination, we

would have to conclude that Doody's claims were made from whole cloth. The record in this case forecloses such a determination, and highlights the unreasonableness of the state court's finding that *no* such evidence existed.

## C.   Harmless Error

**[16]** A coerced confession is generally not admissible evidence. *See id.* However, in this case, Doody's statements confessing his involvement were admitted into evidence and considered by the jury. On habeas review, once we determine, as we discussed above, that the state court's voluntariness determination was an unreasonable application of Supreme Court precedent, we turn to the consideration of whether the error was harmless. "Because the court of appeal[s] found the confession admissible, it did not conduct harmless-error analysis. We must therefore review the evidence at trial to determine whether the confession likely had a substantial and injurious impact on the verdict; if not, its admission was harmless." *Taylor*, 366 F.3d at 1016 (citations omitted). "[T]he question is whether the erroneously admitted evidence had a substantial and injurious effect or influence in determining the jury's verdict." *Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir. 2002), *as amended* (citations and internal quotation marks omitted).

At trial, Doody argued that there was no physical evidence linking him to the temple murders; the investigation was mismanaged; the prosecutor charged three individuals, part of the Tucson Four, who had confessed to the events at the temple; the testimony of the prosecution's key witness, Garcia, was not truthful, because he had a reason to lie given his plea agreement; and Garcia, Caratachea, and Gonzales committed the temple murders and Doody was either not involved in the temple murders at all, or was present only as a bystander.

To counter Doody's arguments, the prosecution introduced the audiotapes of Doody's statements. The prosecution's reli-

ance on the statements is evidenced by its closing arguments, which were replete with references to the audiotapes.[14] For example, the prosecution argued:

> He admits, and this is tape three, page twenty-eight, and at tape nine, page thirteen, Jonathan Doody admits, 'Me and Alex borrowed Rollie's gun.' Corroboration now for Rollie Caratachea's statement to us, and also corroboration for Alex Garcia's statements that they, in fact, did borrow that gun from Rollie. He then admits experimenting with the silencer, tape four. But later he says, tape eleven, that it was for use in the temple. The use of the silencer in the temple, very important. It shows premeditation to commit the murders, support for Alex Garcia's statements. . . . He admits involvement in the temple, tape nine, page eight. He admits that he was involved in the temple crimes. The very next thing he does is he admits that this was with Alex Garcia.

Trial Transcript, July 8, 1993, pp. 36-37.

In rebuttal, the prosecution also referred to Doody's statements to support a felony murder conviction. The prosecution stated:

> Let's do it again. Go inside and let's see what we can get. Tape eleven, pages seventeen to eighteen; tape thirteen, page thirty seven. Those are Jonathan

---

[14]The dissent simultaneously scolds us for reciting the audiotapes at length and for "leav[ing] key sentences, exchanges, and pages of transcript unaccounted for." *Dissenting Opinion*, p. 5887. Yet, the dissent does not give one concrete example of omitted information from the audiotapes that would redeem this interrogation. Because the audiotapes highlight the unreasonableness of the state court's findings, it is completely understandable that the dissenters would prefer that these audiotapes not see the light of day.

Doody's comments. This isn't the State. . . . Mr. Doody is on trial. This is what he said. He told us this. He went back in that temple to see what he could get. . . . They went in there with force, and that's armed robbery, and that's a conviction of felony murder. Pure and simple.

*Id.* at 155-56.

The prosecution commented that the case was "easy because of what Jonathan Doody tells us. Alex Garcia corroborates it, gives us a lot of detail. The evidence, gives a lot of corroboration, a lot more detail. But *you don't have to go beyond Jonathan Doody's statement . . .*" *Id.* at 156 (emphasis added). Despite the dissent's effort to catalog other evidence against Doody, the record reflects that Doody's statements were the linchpin of the prosecution's case.

**[17]** As evidenced by the prosecution's arguments, Doody's statements were integral to the prosecution's case, particularly as "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citations omitted). We cannot conclude that the admission of Doody's confession was harmless error because Doody's statements likely "had a substantial and injurious effect or influence in determining the jury's verdict." *Ghent*, 279 F.3d at 1127.

## IV. CONCLUSION

**[18]** We hold that the Arizona Court of Appeals' decision constituted an unreasonable determination of the facts and an unreasonable application of the governing law to the particular facts of this case. The Arizona Court of Appeals unreasonably concluded that the *Miranda* warnings were clear and understandable, despite the detective's erroneous warnings regarding Doody's right to counsel and the use of qualifying

language to downplay the warnings' significance. Thus, we hold that under the standard of review set forth in AEDPA, Doody is entitled to a writ of habeas corpus on the ground that the *Miranda* warnings the police gave him were inadequate and his confession was therefore inadmissible.[15]

Additionally, the Arizona Court of Appeals' ruling that Doody's confession was voluntary was an unreasonable determination of the facts in light of the audiotapes that reflect the relentless, nearly thirteen-hour interrogation of a sleep-deprived juvenile by a tag team of detectives. The Arizona Court of Appeals also unreasonably applied clearly established federal law when it failed to consider the totality of the circumstances to determine if Doody's will was overborne by the interrogation. Accordingly, we hold that under the standard of review set forth in AEDPA, Doody is entitled to a writ of habeas corpus on the ground that his confession of his involvement in the temple murders was involuntary, and therefore inadmissible.

Accordingly, we **REVERSE** and **REMAND** this case to the district court to grant Doody's habeas petition unless the State of Arizona elects to retry Doody within a reasonable time.

---

[15]Our dissenting colleagues' early reference to the recent Supreme Court decision of *McDaniel v. Brown*, 130 S.Ct. 665 (2010), *see Dissenting Opinion*, p.5852, is puzzling. *Brown* involved this court's application of *Jackson v. Virginia*, 443 U.S. 307 (1979) in resolving a sufficiency-of-evidence challenge. *See Brown*, 130 S.Ct. at 667 ("We granted certiorari to consider whether [the District Court and Court of Appeals] misapplied *Jackson*."). The discussion of § 2254(d)(1) was made in the context of our described failure to "review the evidence in the light most favorable to the prosecution" as required by *Jackson*. *Id.* at 673 (citation and internal quotation marks omitted). In contrast, this case concerns review of the adequacy of a *Miranda* warning and the voluntariness of a confession, neither of which is governed by the *Jackson* directive to view all evidence in the light most favorable to the prosecution.

KOZINSKI, Chief Judge, concurring in the result:

Not for the first or last time, we're asked to consider what it means for an opinion of a state court to be "unreasonable" under 28 U.S.C. § 2254(d). I write separately because I believe that deference is neither a blindfold nor a bandana.

The state court may well have been wrong to find Doody's confession voluntary. Doody, a teenager, was isolated from his friends and family and interrogated for over twelve hours. Working in shifts, police kept Doody awake overnight. They employed many of the psychological techniques that troubled the Supreme Court in *Miranda* v. *Arizona*:

> To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. . . . He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must "patiently maneuver himself or his quarry into a position from which the desired objective may be attained." When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance . . . . The police then persuade, trick, or cajole him out of exercising his constitutional rights.

384 U.S. 436, 455 (1966). The police pled with Doody, over and over, to "tell me," "trust me" and "[t]alk to me so I understand." They ordered him: "You have to tell us." They warned him: "There are statements, I'd say damaging statements toward you and its gonna, and its gonna pile up Jon, it's gonna be so deep." They said they knew "you've got some tremendous answers up in that, that head of yours" because they "could just tell it in your eyes," and they lied to him: "I probably won't ask you a question, that I don't already know

the answer." They promised him, falsely, that his words were "between us," and that "[w]hat you tell us right now, is gonna stay right here." Doody was silent for long periods of questioning, and he ended the interrogation in tears.

But that's not the only way to read the record. As the state court noted, Doody was nearly eighteen, maintained good grades and "participated in his high school honor guard." *State* v. *Doody*, 930 P.2d 440, 445 (Ariz. Ct. App. 1996). The officers employed a "courteous, almost pleading style of questioning" and "testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation." *Id.* at 446. The officers also "offered Doody food and drinks and accommodated his requests to use the restroom." *Id.* During his long periods of silence, Doody may have been thinking up a story that would fit the evidence against him but also keep him out of trouble. Indeed, when Doody confessed, he gave a relatively exculpatory account in which he was outside the temple at the time of the killing. He started crying, he said, because the police "came out and ma[d]e it sound like [they] didn't believe" that version of events. That's the statement of a person who had staked his future on a half-truth, as opposed to someone whose will was overborne.

I doubt anyone but Doody will ever know with certainty whether his confession was voluntary, and perhaps not even he. After all, "Difficulties of proof and subtleties of interrogation . . . [make] it impossible in most cases for the judiciary to decide with confidence whether [a] defendant . . . voluntarily confessed." *New York* v. *Quarles*, 467 U.S. 649, 683 (1984) (Marshall, J., dissenting). The majority spins a good yarn, but the state court also told a good story. Even federal judges can't read Doody's mind or travel back in time. And, as the Supreme Court has told us, "The more general the rule, the more leeway courts have in reaching outcomes." *Yarborough* v. *Alvarado*, 541 U.S. 652, 664 (2004). This is precisely the kind of debatable application of a "general standard" where finality and respect for the independent judgment of the

state courts counsels the highest deference on federal habeas review. *See Knowles* v. *Mirzayance*, 129 S. Ct. 1411, 1420 (2009); *see also Harrington* v. *Richter*, 131 S. Ct. 770, 786 (2011). I would therefore let stand the state court's finding that the confession was voluntary.

But, unlike voluntariness, "a warning is a clearcut fact." *Miranda*, 384 U.S. at 469. Voluntariness asks courts to speculate about intangibles, but *Miranda* seeks "*ascertainable* assurance that the accused was aware" of his rights. *Id.* at 472 (emphasis added). It therefore provides a "clear, easily administered device for ensuring that criminal suspects understand their constitutional rights," *Quarles*, 467 U.S. at 683 (Marshall, J., dissenting), and experience has proved that its bright line rule is manageable "for law enforcement officers to conform to, and for courts to apply in a consistent manner," *Dickerson* v. *United States*, 530 U.S. 428, 444 (2000). Accordingly, when a state court asks whether a suspect was adequately warned, "[a]pplications of the rule may be plainly correct or incorrect." *Yarborough*, 541 U.S. at 664. We need not defer to plainly incorrect applications.

From tapes of the interrogation, we know exactly what the police said when informing Doody of his right to an attorney:

> [Y]ou have the right to have an attorney present prior to and during questioning, and what that means that if you want one, you're allowed to have a lawyer here before and during you know my questions to you, okay. And then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we think that you or somebody else is involved in, *if you were involved in it*, okay. Again, it not necessarily mean that you are involved, but *if you were, then that's what that would apply to okay*. (emphasis added)

We can listen as the officer recites the familiar words: "[Y]ou have the right to have an attorney." And we can listen as he

provides a generic and inoffensive definition of "attorney": "[A] lawyer who will speak for you and help you." And, finally, we can observe in slow motion as the officer's *Miranda* warnings fly off the rails: "[I]f you were involved in it, okay. Again, it not necessarily mean that you are involved, but if you were, then that's what that would apply to okay." Those words are undisputed facts.

Faced with those facts, the Arizona Court of Appeals found that Doody's rights were read to him "in a clear and understandable manner" and that the "officers read each warning from a standard juvenile form and provided additional explanations as appropriate." *Doody*, 930 P.2d at 449. The dissent tells us that the state court's characterization of the officer's words was not unreasonable because the officer made Doody aware that he was "faced with a phase of the adversary system." Dissent at 5872 (quoting *Miranda*, 384 U.S. at 469). I don't see anything so benign lurking in the officer's words. Here they are again:

> [A]n attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we think that you or somebody else is involved in, if you were involved in it, okay. Again, it not necessarily mean that you are involved, but if you were, then that's what that would apply to okay.

The officer did say something about the adversary system: That a lawyer will help you "if you were involved" in criminal activity, and that the right to an attorney only applies to you if "you were involved." This, of course, is not true: The innocent, no less than the guilty, are entitled to a lawyer. Or, in Officer Riley's peculiar argot: "Whether you were involved or not, then that's what that would apply to okay."

The dissent admits that the officer's words "*could* be construed" to say you only get a lawyer if you're guilty. Dissent at 5870. This pretty much gives up the ship, as warnings that

"could" be construed in such a manner can't possibly be "clear," "understandable" or "appropriate." It is established beyond doubt that "an individual held for interrogation must be *clearly* informed that he has the right to consult with a lawyer," *Miranda*, 384 U.S. at 471 (emphasis added), and that warnings must "apprise the accused of his right to have an attorney present," *Duckworth* v. *Eagan*, 492 U.S. 195, 205 (1989). The whole point of *Miranda* is to provide "assurance that the accused was aware" of his rights. 384 U.S. at 472. There's no such assurance when a warning "could" be interpreted to say the polar opposite of what *Miranda* requires.

The warning given in this case was far worse than no warning at all. At least an un-warned suspect may know his rights without being told about them; many non-lawyers watch *Cops* and *Law and Order*. But a non-lawyer who knows about the right to counsel, and who might even be willing to invoke it without a warning, may well hesitate to ask for a lawyer after being told that the right would only apply "if you were involved." After all, a request for a lawyer would be an admission that "you were involved," as only suspects who knowingly fall into that category would have a right to ask for one. Upholding such a warning would contravene the very core of the rule established by *Miranda*: When the Court prescribed words that would make suspects aware of their rights, it certainly did not intend to approve warnings that would throw those rights into doubt and make invocation of the right to counsel even less likely than it is already.

Here's a simple test of the warning's adequacy: Suppose everything the officer said had been printed on a standardized waiver produced by the state, without all the "colloquial filler" the dissent thinks we should ignore. Dissent at 5869. Since this was Arizona, the birthplace of *Miranda*, maybe police felt they were entitled to improve on the Supreme Court's work; call it Miranda 2.0:

> You have the right to an attorney present prior to and during questioning. An attorney is a lawyer who will

speak for you and help you concerning the crime, if you were involved in it. It doesn't necessarily mean you are involved, but if you were, then that right would apply to you. Do you understand this right? Yes_____ No_____

Now suppose Doody had initialed such a form. Would we uphold the warning just because it contained the magic words, "You have the right to an attorney"?

Although the officer spoke the words instead of printing them on paper, this is a distinction without a difference. As the state court acknowledged, the officer's statements were made at the same time that Doody read his written warnings and were offered as "explanations" of the rights Doody agreed to waive. *Doody*, 930 P.2d at 449. If Miranda 2.0 doesn't pass muster, neither does the warning in this case.

The Supreme Court's recent decision in *Florida* v. *Powell*, 130 S. Ct. 1195 (2010), doesn't change this analysis, as the opinion reaffirms the standard for determining *Miranda* compliance that its prior cases had established. *Id.* at 1204 (citing *Duckworth*, 492 U.S. at 204-05; *California* v. *Prysock*, 453 U.S. 355, 360-61 (1981) (per curiam)). Nor do the facts in *Powell* have any significant bearing on this case. Tampa police read Powell the following statement to serve as his *Miranda* warnings:

> You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.

*Powell*, 130 S. Ct. at 1200. The Florida Supreme Court found this statement misleading because it suggested that Powell

only had a right to consult with an attorney before, and not throughout, his interrogation. The Supreme Court reversed because "[n]othing in the words used indicated that counsel's presence would be restricted after the questioning commenced." *Id.* at 1205. The Court found that the final warning, "You have the right to use any of these rights at any time you want during this interview," cured whatever misleading effect the other statements had. Although the warnings were "not the *clearest possible* formulation of *Miranda*'s right-to-counsel advisement," the Court upheld them as "sufficiently comprehensive and comprehensible when given a commonsense reading." *Id.*

Not so here. The *Miranda* warnings Doody was given were affirmatively misleading. Doody wouldn't have had to "imagine" a "counterintuitive" or "unlikely" scenario to think counsel was only available to individuals actually involved in a crime. *Id.* And, unlike *Powell*, no other part of the officer's warnings corrected the error. The officer's statement simply didn't communicate *Miranda*'s "essential message," as *Powell* requires. *Id.* at 1206.

*Powell* isn't an AEDPA case and doesn't provide any guidance on how much deference we owe to state courts. Even under AEDPA, however, it's not possible to bend the record far enough to sustain the state court's opinion, if habeas corpus is to "stand[ ] as a safeguard against imprisonment of those held in violation of the law." *Richter*, 130 S. Ct. at 780. The dissent is correct that the Supreme Court has repeatedly overturned this court for insufficient deference. Dissent at 5852-53. But the Court has also said that AEDPA's "standard is demanding but not insatiable" and that " 'deference does not by definition preclude relief.' " *Miller-El* v. *Dretke*, 545 U.S. 231, 240 (2005) (alteration omitted) (quoting *Miller-El* v. *Cockrell*, 537 U.S. 322, 340 (2003)). In *Anderson* v. *Terhune*, we found that AEDPA did not require us to manufacture uncertainty and ambiguity as to whether a suspect invoked his right to silence when he said, "I plead the Fifth."

516 F.3d 781, 787 (9th Cir. 2008) (en banc); *see also Hart* v. *Attorney Gen. of Fla.*, 323 F.3d 884, 894 (11th Cir. 2003). Comity doesn't mean being comatose. We can't ignore the fact that the state court in this case held up the officer's language as a model application of *Miranda* even though his words were misleading at best and flat wrong at worst—not just "less-than-accurate," as the dissent concludes. Dissent at 5869.

We defer when state courts reasonably adjudicate claims of federal right, even if we think they're wrong. *Richter*, 131 S. Ct. at 786. But where, as here, a state court doesn't act reasonably, deference comes to an end. After all, we retain "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Id.* Yes, the standard is a "difficult" one to meet, *id.*, but difficult doesn't mean impossible. When police take a butcher knife to *Miranda*, a decision so "embedded in routine police practice to the point where the warnings have become part of our national culture," a federal court can't sit idly by. *Dickerson*, 530 U.S. at 443.

The dissent offers a number of other arguments for denying relief, even if the warnings weren't "clear," "understandable" or "appropriate." *See* Dissent at 5868-73. For example, the dissent points to evidence the state court considered that "Doody exhibited no signs of doubt or confusion." Dissent at 5871 (internal quotation marks omitted). Maybe Doody wasn't listening to what the officer said, or maybe he didn't believe it. But that's entirely irrelevant. *Miranda* establishes an objective test. We can't uphold defective warnings because they might have been inadvertently successful, just as we can't disregard a properly administered warning because a particular suspect might have misunderstood.

Nor did anything in the Supreme Court's opinion in Duckworth cast doubt on the relevant legal principles. *See* Dissent

at 5865-66, 5869-71. In that case, police told a suspect that
they had "no way of giving you a lawyer, but one will be
appointed for you, if you wish, if and when you go to court"
and that "[y]ou also have the right to stop answering at any
time until you've talked to a lawyer." *Duckworth*, 492 U.S. at
198 (emphasis omitted). The Court of Appeals thought this
wrongly implied that the right to counsel did not apply before
a suspect went to court, but the Supreme Court held that the
Court of Appeals had "misapprehended the effect" of the lan-
guage. *Id.* at 203. The Court emphasized that the warning was
entirely true and "accurately described the procedure for the
appointment of counsel in Indiana," according to which invo-
cation of the right to counsel would require police to cease
questioning altogether unless the suspect paid for his own
lawyer. *Id.* at 204. Nothing in the Court's opinion suggested
that officers are permitted to make untrue statements that con-
tradict the warnings required by *Miranda*. To the contrary, the
Court reaffirmed that warnings must adequately "apprise the
accused of his right to have an attorney present." *Id.* at 205.

Finally, the dissent would deny relief because "Doody was
simultaneously looking at a written form that clearly laid out
the warnings," and the Supreme Court has not "indicated what
effect simultaneously acknowledged written warnings might
have when the oral warnings are unclear." Dissent at 5870,
5871. It would be unreasonable to think that the written warn-
ings remedied the harm. They said:

> You have the right to have an attorney present prior
> to and during questioning. (This means, if you want
> one, you are allowed to have a lawyer here before
> and during my questions to you. An attorney is a
> lawyer who will speak for you and help you con-
> cerning the crime which we think you have done.)

There's nothing wrong with the written warnings, taken in
isolation, but Doody read the warnings at the same time the
officer offered his "explanation" of the scope of the right to

counsel. The written warnings don't say that the right to counsel applies to the innocent as well as the guilty, and they don't contradict the officer's statement that the right would apply only if Doody was "involved." Assessing the Miranda warnings "in their totality" and "[i]n context," a reasonable suspect would assume that the oral warnings clarified the written ones. *Powell*, 130 S. Ct. at 1204, 1205; Dissent at 5871. The written warnings cannot provide the "assurance" that Doody was aware of his rights that *Miranda* requires.

For over forty years, it has been clearly established that statements made during custodial interrogation cannot be admitted into evidence unless the defendant was adequately warned of his rights and the consequences of waiver. *See Miranda*, 384 U.S. at 479. The warnings required by *Miranda* are brief and very simple; most people—and certainly all police—know them by heart. It's not too much to ask that police recite them as prescribed by the Supreme Court, and not augment them in a way that will obscure their meaning and undermine their effect.

Thanks to *Miranda*'s simple rule, this is a simple case. We'll never know whether Doody's statements were voluntary, but it's plain to see that he wasn't properly read his rights. We must grant his petition on that ground alone.

---

TALLMAN, Circuit Judge, with whom Judges RYMER and KLEINFELD join, dissenting:

The Supreme Court has repeatedly told us to adhere to the highly deferential standard of review of state court judgments that the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), requires in federal habeas cases. But my colleagues continue to treat this case as if it were on direct appeal to be reviewed de novo. The majority will not yield to the shot across our bow fired by the Supreme

Court when it granted Arizona's petition for certiorari and vacated and remanded our original en banc decision for reconsideration in light of *Florida v. Powell*, 130 S. Ct. 1195 (2010)—a case that reaffirms the Court's precedent under which the Arizona Court of Appeals' decision upholding Doody's confession reasonably fits. *See Ryan v. Doody*, 131 S. Ct. 456 (Oct. 12, 2010) (Mem.). Subsequently, the Court fired a torpedo amidships in *Harrington v. Richter,* 131 S. Ct. 770 (2011). But the majority steams defiantly ahead, far from the rest of the fleet. I respectfully dissent.

Virtually ignored by my colleagues in the majority is the fact that Arizona conducted a ten-day evidentiary hearing and a thirty-four day trial. Four judges and twelve jurors thoroughly reviewed all of the circumstances surrounding Doody's interrogation. All concluded that his confession was voluntary. AEDPA obligates us to affirm this conclusion unless it was objectively unreasonable. 28 U.S.C. § 2254(d). The majority nonetheless parses the record and re-weighs the evidence to reach what is effectively a de novo determination —and then strikes down the Arizona court's decision when it arrives at a different result.

The Supreme Court recently chastised us again for doing this. *Richter*, 131 S. Ct. at 785 ("The [Ninth Circuit] Court of Appeals' lengthy opinion . . . discloses an improper understanding of § 2254(d)'s unreasonableness standard. . . . A state court must be granted a deference and latitude that are not in operation [on direct review]."); *see also McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) ("[T]he [Ninth Circuit] Court of Appeals' discussion of the . . . evidence departed from the deferential review that . . . § 2254(d)(1) demand-[s]."); *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419-20 (2009) ("The [Ninth Circuit] Court of Appeals reached [the wrong] result based, in large measure, on its application of an improper standard of review. . . . The question is not whether a federal court believes the state court's determination . . . was incorrect but whether that determination was unreasonable—

a substantially higher threshold.") (internal quotation marks omitted); *Waddington v. Sarausad*, 129 S. Ct. 823, 833 (2009) ("The reasoning of the [Ninth Circuit] Court of Appeals . . . failed to review the state courts' resolution of this question through the deferential lens of AEDPA[.]"); *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) ("The requirements of [AEDPA], of course, provide additional, and binding, directions to accord deference. . . . By not according the required deference, the [Ninth Circuit] Court of Appeals failed to respect the limited role of federal habeas relief in this area prescribed by Congress and by our cases."); *Schriro v. Landrigan*, 550 U.S. 465, 475-80 (2007); *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) ("An '*unreasonable* application of federal law is different from an *incorrect* application of federal law.' The Ninth Circuit did not observe this distinction, but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).") (citation omitted).

But we are unrepentant. I recognize that some of my colleagues would have decided this case differently than the Arizona state courts did. But "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."[1] *Richter*, 131 S. Ct. at 786.

---

[1]The majority is mistaken when it suggests that *Richter*'s forceful admonitions regarding AEDPA deference apply only in the context of *Strickland* claims. *See* Maj. Opinion at 5812 n.5. The fact that *Richter* acknowledged both that the petitioner's case raised a challenge to a state court's application of the *Strickland* standard, 131 S. Ct. at 780, and that the Strickland standard is itself a deferential one, *id.* at 788, is unremarkable and in no way suggests that AEDPA somehow operates differently depending on the nature of the underlying habeas claim. Furthermore, in *Richter*, the Court explicitly indicated that it took issue with the Ninth Circuit's misapplication of the AEDPA standard generally. *See id.* at 785 (noting that the Ninth Circuit's opinion under review "discloses an improper understanding of § 2254(d)'s unreasonableness standard *and* of its operation in the context of a *Strickland* claim") (emphasis added). Indeed, the AEDPA reversals I cite on pages 5852-53 are not confined to

The Arizona court's factual determinations were not unreasonable, nor did its legal conclusions contravene controlling Supreme Court precedent. We should affirm the dismissal of Doody's habeas petition.

# I

## A

In August 1991, Phoenix, Arizona, was rocked by nine brutal murders at a Buddhist temple. *State v. Doody*, 930 P.2d 440, 443 (Ariz. Ct. App. 1996). The crime scene was pure carnage. "The victims, including six Buddhist monks, lay face down in a circle, each shot execution-style in the head. Several of the victims had sustained additional, non-fatal shotgun wounds. Living quarters inside the temple had been ransacked, and items of personal property, including money, cameras, and stereo equipment, were missing." *Id.* A massive investigation followed.

Prosecutors initially charged four men from Tucson, Arizona, with the murders. *Id.* Then, during a routine traffic stop on Luke Air Force Base near Phoenix, police found the .22 caliber rifle used to shoot the victims. *Id.* The owner of the rifle, Rolando Caratachea, denied any involvement in the murders, but said that his roommate, Jonathan Doody, and a friend, Alessandro Garcia, "had borrowed the rifle shortly before the murders." *Id.* at 444.

At that time, Doody was seventeen-and-one-half years old. He was born in Thailand but moved to the United States as

---

*Strickland* claims or to any other particular type of claim. The relevance to the case we now review of *Richter*'s repeated elucidations of the high level of deference we must accord under AEDPA is in no way diminished simply because *Richter* involved a different type of underlying claim. When the Supreme Court condemns our "judicial disregard" for AEDPA, *Richter*, 131 S. Ct. at 780, it is time to pay heed.

a child with his American stepfather, who was in the Air Force, and his Thai mother. His mother and brother were members of the temple where the murders occurred, and his brother had been a novice monk there. Doody visited the temple when his brother was there. Doody spoke fluent but lightly accented English. He was a junior in high school, "maintained a B grade average," was commander of the junior Reserve Officers' Training Corps Honor Guard and Color Guard, and worked at the Luke Air Force Base commissary. *Id.* at 445-46. Emancipated from his parents, who had moved to Colorado, Doody lived in an apartment in Arizona with Caratachea and another friend.

Based on the scope of the crime—which required controlling nine victims while ransacking the temple and then methodically executing them—the police deduced that several people were involved. Maricopa County Sheriff's detectives located Doody, dressed in his ROTC uniform, at a high school football game on a Friday night. *Id.* at 443-44. Detective Riley, who had spoken with Doody earlier in the investigation, explained there were now some additional questions about Caratachea's rifle and asked if Doody was willing to come to the Sheriff's office. Doody assented and climbed into the detective's car.

When they arrived, Doody was placed in what had been the office of a deputy Maricopa County attorney rather than an interrogation room. An officer started a tape recorder. Although Doody was not yet a suspect, Detective Riley nonetheless advised him of his *Miranda* rights. Riley read each warning from the standard juvenile Miranda form, which he gave Doody to follow along. The written text that Doody simultaneously read and initialed appears in the attached Appendix. The *Miranda* form's very last admonition, separated from the numbered warnings, states, "If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a law-

yer." Doody indicated, by initialing the document, that he understood this right, too. At no time did he stop the questioning or ask for a lawyer.

In addition to the printed text, Riley offered some explanation of each right. He paused after each one while Doody indicated he understood the printed right and initialed it on the form. Riley also told Doody several times that if he had any questions, he should feel free to ask. Doody declined to have a parent or attorney present and clearly expressed that he was willing to talk with the officers.

Detective Riley began the interrogation around 9:25 p.m. by questioning Doody about his roommate's rifle. "Doody initially denied any knowledge of the events at the temple but, after two and one-half hours, made inculpatory statements and, after approximately four more hours of questioning, admitted to being at the temple on the night of the murders." *Id.* at 444. Based on these incriminating admissions, the officers continued their questioning and Doody slowly became more forthcoming.

The interrogation ultimately lasted nearly thirteen hours. Over the course of the interrogation, Doody admitted he helped plan the assault on the temple with others, including Garcia. He recounted, "We borrowed the rifle . . . to see if we [could] make a silencer . . . ." Tape 11, p. 25. He answered "Yes" to the question "Were you going to use the silencer in the temple?" *Id.* He said they "drove past the place twice." *Id.* at p. 3. It was "just going to be a joke and it just went downhill. We entered the temple, one through each door. Everything was done in clockwork . . . ." Tape 10, p. 8. "We . . . searched the place for any security." *Id.* at p. 12. "They were laying down . . . face down." *Id.* at p. 14. "And then I guess, I don't know, somebody panicked or something, and started firing and then constant .22 fire." Tape 15, p. 13. "We ran out. Got into a car. We just took off." Tape 10, p. 14.

Doody claimed they originally intended only to conduct a "war game" to see if they could surround the building without setting off the security system, but his co-conspirators then ransacked the living quarters and gathered the victims. Doody maintained that someone else suggested they eliminate the witnesses after one of the monks recognized an accomplice, and that Doody was sent outside the building to determine whether anyone could hear shots from inside when the nine killings occurred. Garcia, who was being separately questioned the same night, said it was Doody who insisted they "leave no witnesses," and Doody who pulled the trigger.

## B

Based on their interlocking confessions and evidence which corroborated those confessions, Doody and Garcia were charged with robbery and murder. Early in pretrial proceedings, Doody moved to suppress his confession.[2] The trial court conducted an exhaustive evidentiary hearing, lasting ten days, to determine whether Doody's confession was voluntary. The officers who questioned Doody all testified, and the court heard all thirteen hours of audio tape from the interrogation. Doody did not take the stand to contradict the officers. The written *Miranda* warnings Doody read and acknowledged were admitted into evidence. The court considered all of the relevant circumstances, credited the testimony of the detectives as to Doody's demeanor, and concluded from the totality of the evidence presented that Doody confessed voluntarily, after knowingly and intelligently waiving his constitutional rights. *Doody*, 930 P.2d at 445.

Doody proceeded to trial, which lasted thirty-four days.

---

[2]Garcia also moved to suppress his own confession, but thereafter entered into a plea agreement in which he pled guilty to nine counts of first degree murder and one count of burglary. He also agreed to testify against Doody. In exchange, the prosecution agreed not to seek the death penalty against Garcia.

The jury heard all thirteen hours of Doody's interrogation as well as other corroborating evidence linking him to the crime. That evidence included incriminating statements Doody made to friends after the murders, his fingerprints located on loot taken from the temple, the fact that he made a substantial cash down payment to purchase a car shortly after the crime (during which $2,650 in cash was taken), and Garcia's accomplice testimony. The jury was instructed that Doody's statement was not voluntary if it resulted from his "will being overcome by a law enforcement officer's use of any sort of violence, coercion, or threats, or by any direct or implied promise, however slight." *Id.* at 448.

The jury obviously found none, because it convicted Doody on every count. The jury held Doody liable for the nine murders on a theory of felony murder rather than premeditated murder. The trial court sentenced Doody to nine consecutive life terms for the murders and eleven additional prison terms on the remaining felony counts.

Doody appealed his convictions, arguing, *inter alia*, that the trial court erred in failing to suppress his confession. He claimed the totality of the circumstances rendered the confession involuntary and that the *Miranda* warnings were inadequate. The Arizona Court of Appeals rejected both arguments in a lengthy reasoned opinion. *See State v. Doody*, 930 P.2d 440, 443 (Ariz. Ct. App. 1996). It considered all of the circumstances surrounding Doody's confession, including his age and intelligence, the length of the interrogation, the absence of a parent (even though Doody was fully emancipated), and the tone and tactics employed by the detectives throughout the interrogation. The court concluded the tactics were not unduly oppressive and Doody had confessed voluntarily. *Id.* at 446-48.

The Arizona Court of Appeals also rejected Doody's argument that the warnings were inadequate. Upon review of the audiotape of the warnings, the signed written waiver, and the

interrogating officers' testimony regarding Doody's demeanor, the court found "the officers explained [Doody's] rights in a manner appropriate for his age and apparent intelligence." *Id.* at 449. The court affirmed Doody's convictions.

The Supreme Court of Arizona denied review, and the Supreme Court of the United States denied Doody's petition for a writ of certiorari. The United States District Court for the District of Arizona denied Doody's subsequent federal habeas petition. A three-judge panel of our court, including two members of today's majority, reversed, holding the Arizona Court of Appeals was not objectively unreasonable in concluding the *Miranda* warnings were adequate, but ruling that Doody's confession was nonetheless involuntary because the interrogation lasted too long. The panel granted habeas relief. *See Doody v. Schriro*, 548 F.3d 847, 849 (9th Cir. 2008). We granted rehearing en banc. *See Doody v. Schriro*, 566 F.3d 839 (9th Cir. 2009).

## II

Contrary to the majority's penchant for unrestricted reconsideration, the "elephant in the courtroom" here is the standard of review. *Wong v. Belmontes*, 130 S. Ct. 383, 390 (2009). Under AEDPA, we may not grant habeas relief unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is an "unreasonable application of . . . clearly established law" only if it is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). A federal court may not issue a writ of habeas corpus merely because it concludes "in its independent judgment" that the state court erred. *Id.* at 411.

Nevertheless, the majority reviews the record as though it were the initial finder of fact or reviewing a federal conviction

on direct appeal, and, when it arrives at a result that differs from the state court's, declares the state court to have been "unreasonable." *Cf. Richter*, 131 S. Ct. at 786 (noting that after conducting a de novo review, the Ninth Circuit "declared, without further explanation, that the 'state court's decision to the contrary constituted an unreasonable application of [Supreme Court precedent]"). But "AEDPA demands more. Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* By failing to make this inquiry, the majority has again "all but ignored the only question that matters under § 2254(d)(1)." *Id.* (internal quotations and citation omitted). The *Doody* majority once more pays mere lip service to AEDPA and then proceeds as though it does not exist.

## III

Doody understood and voluntarily waived his constitutional rights. *Miranda v. Arizona* requires that prior to custodial questioning, an accused must be "clearly informed" of his rights. 384 U.S. 436, 471 (1966). When considering the adequacy of a *Miranda* advisement, "reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.' " *Powell*, 130 S. Ct at 1204 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989)) (internal quotation marks and citation omitted).

The oral delivery of the warnings, which the majority characterizes as a "twelve-page rambling commentary that is in alternating part misleading and unintelligible," Maj. Opinion at 5811-12, proceeded as follows while Doody read the written warnings laid before him on the table:

*Detective Riley*: Ah, what this is, is that ah you have the right to remain silent and ah, and what it states is that this means that you do not have to talk to me or answer any questions about ah, the matter that we're going to discuss with you, okay. You can be quiet if you, if you wish. Okay, did you understand that?

*Doody*: Uh-huh.

*Detective Riley*: Okay, ah, as we go here, they ah, they ask that you initial ah, here indicating that I read it to you and that you understand it. Ah, so if you could ah, as we go, I will go ahead and just have you initial in the box whether you do or don't.

*Doody*: Okay.

*Detective Riley*: Okay. And the next one is that anything that you say can and will be used against you in a court of law and what this means is that anything that you tell me, I can use later against you in court and a court of law is a place where a judge will decide whether ah, you did something or whether you didn't do something, okay. And a judge is like an umpire in a baseball game. He decides whether you have acted in a right or wrong way, okay. Ah, if you did something wrong ah you may be punished and if you didn't you won't be punished, okay. Do you understand all of that?

*Doody*: Uh-huh.

*Detective Riley*: Okay, if you could just initial there. Okay, and the next one states that you have the right to have an attorney present prior to and during questioning, and what that means is that if you want one, you're allowed to have a lawyer here before and dur-

ing you know my questions to you, okay. And then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we might think that you or somebody else was involved in, if you were involved in it, okay. Again, it [sic] not necessarily mean that you are involved, but if you were, then that's what that would apply to okay. And do you understand that?

*Doody*: Yeah.

*Detective Riley*: Any questions?

*Doody*: No.

*Detective Riley*: Okay. Okie doke.

*Doody*: Oh yeah what's this for?

*Detective Riley*: Ah, okay I'll, again I'm gonna go in and, and explain some things to you. Ah, in the next one states that if you cannot afford an attorney, you'd have the right to have one appointed for you prior to questioning okay, and what this means, is if you do not have the money to get a lawyer ah, if you wished ah, one will be given to you free of charge before any questions and things like that, okay. Do you understand that?

*Doody*: Uh-huh.

After delivering the *Miranda* warnings and obtaining Doody's written confirmation that he understood them, Detective Riley asked Doody if he wished to have a parent or guardian present. Doody said he did not. Detective Riley then asked, "Ah, so you will be willing to talk with us right now?" Doody replied, "Yeah." Before asking any questions, Detective Riley, still following the written form, again confirmed that

Doody was willing to talk without a a parent or an attorney present, that he knew he could stop the interrogation "at any time," and that he understood the warnings:

> *Detective Riley*: And at the bottom here is what it's saying is that ah, if ah, you have no problem with ah talking to myself and David here right now, with ah, without anybody else present or an attorney, or your parents, or, or anyone ah, then as I said, we have some things we'd like to ask you and we'd like to do that. Ah, and if you have no problem with that, we'd like to talk to you about that. Ah, but if you want to then ah, to stop at any time, that's something you can do as well. Okay. Do you have any questions at all about any of these things I've, I've explained to you?
>
> *Doody*: Ah, No.
>
> *Detective Riley*: Okay. Do you understand all the things that I have read to you?
>
> *Doody*: Yes.
>
> *Detective Riley*: Okay. And all that says here is that you do understand all those, and if you do, if you'll just initial the right box there. Okay. And again, is there any questions at all Jonathan about, about any of that that I read to you?
>
> *Doody*: No, no.

Following its ten-day pre-trial evidentiary hearing, the Maricopa County Superior Court ruled these warnings were adequate. The Arizona Court of Appeals affirmed the trial court and concluded, in language echoing the post-*Miranda* legal standard articulated by Arizona caselaw, that the warnings were delivered "in a clear and understandable manner . . . appropriate for [Doody's] age and apparent intelligence."

*Doody*, 930 P.2d at 448-49 (citing *State v. Mumbaugh*, 491 P.2d 443, 451 (Ariz. 1971), for the requirement that the officers must have "imparted a clear, understandable warning of all defendant's rights . . . in language the defendant could comprehend and on which he could intelligently act"). This conclusion fits reasonably within the bounds of federal law as determined by the Supreme Court as to what constitutes a sufficiently "clear" *Miranda* warning. My colleagues disagree and assert that there is no possibility that a fairminded jurist could conclude otherwise. Maj. Opinion at 5811-12.

While the Supreme Court has not decided a case with facts "materially indistinguishable" from the facts before us, *Williams*, 529 U.S. at 406, it has certainly instructed us as to how to approach our adequacy analysis. The Supreme Court has never insisted that *Miranda* warnings be given verbatim as set forth in that opinion. *Duckworth*, 492 U.S. at 202. Indeed, the Court has repeatedly cautioned against rigid requirements as to the form of *Miranda* warnings. *See id*; *California v. Prysock*, 453 U.S. 355, 359 (1981). It has done so once again in *Powell*, which reiterates that, while "[t]he four warnings *Miranda* requires are invariable"—including "the right to consult with a lawyer and to have the lawyer [present] during interrogation,"—the Supreme Court "has not dictated the words in which the essential information must be conveyed." 130 S. Ct. at 1203-04 (internal quotations and citations omitted). The longstanding test is simply whether the words that are used "reasonably convey" the four crucial rights. *Id.* at 1204 (quoting *Duckworth*, 493 U.S. at 203).

In *Powell*, the Supreme Court held that an officer's statements to a suspect that "You have a right to talk to a lawyer before answering any of our questions" and "You have the right to use any of these rights at any time you want during this interview," reasonably conveyed the suspect's right to counsel. *Id.* at 1199-1200, 1205. Even though the officer never explicitly stated that the right to counsel applied not only before, but *during*, questioning, the Court found that the

warnings, while not "the *clearest possible* formulation . . . were sufficiently comprehensive and comprehensible when given a commonsense reading." *Id.* at 1205.

*Powell* thus echoed *Prysock*, in which the Supreme Court upheld warnings that advised a suspect of his right to have a lawyer present prior to and during questioning, and to have a lawyer appointed "at no cost to yourself," but not expressly to his right to have the *appointed* lawyer present prior to and during questioning. 453 U.S. at 356-57. The Court held that the warnings nonetheless "fully conveyed" the rights spelled out in *Miranda,* which did not require a "talismanic incantation . . . to satisfy its strictures." *Id.* at 359, 361.

*Powell* also cited to *Duckworth*, which is more analogous to Doody's case. *See Powell*, 130 S. Ct. at 1204. In *Duckworth*, the Supreme Court upheld a warning even when it was accompanied by an arguably misleading elaboration. There, the police read the suspect his rights from a form that he later signed which provided in part: "You have [the] right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.*" *Duckworth*, 492 U.S. at 198 (original emphasis). The Seventh Circuit rejected the warnings, finding that the "if and when you go to court" language could be understood to negate a suspect's right to appointed counsel *before* and *during* the impending interview: "The entire warning is therefore, at best, misleading and confusing and, at worst, constitutes a subtle temptation to the unsophisticated, indigent accused to forego the right to counsel at this critical moment." *Eagan v. Duckworth*, 843 F.2d 1554, 1557 (7th Cir. 1988).

The Supreme Court, however, reversed and held that the warnings "in their totality" were adequate. *Duckworth*, 492 U.S. at 205. It noted that officers may "inadvertently depart from routine practice" when offering elaborations for the benefit of a suspect, and that reviewing courts should therefore

not examine the language used "as if construing a will or defining the terms of an easement." *Id.* at 203. Notwithstanding the potential false implication of the elaborating language, the Court found that the warnings had "touched all of the bases required by *Miranda*": the police told the suspect of his right to remain silent, that anything he said could be used against him in court, that he had a right to an attorney before and during questioning, and that he had the right to an attorney even if he could not afford to hire one. *Id.*

My colleagues are correct that *Powell* does not materially change the analysis we must apply to the case at hand: it reaffirms the two prior Supreme Court cases, *Prysock* and *Duckworth*, that establish the federal law demonstrating why the Arizona Court of Appeals' decision is reasonable. Those two cases stand for the following general principles: first, that deviation from a formulaic *Miranda* script is tolerated so long as a suspect's rights are "reasonably conveyed"; and second, that elaborating language—even if it is misleading—is not necessarily fatal to a Miranda warning if the warnings "in their totality" communicate the four basic rights. Undaunted, my colleagues persist in declaring that the Arizona Court of Appeals was not only wrong, but *objectively unreasonable*, when it decided that the warnings given to Doody, which including an ambiguous oral elaboration on the meaning of the word "attorney," but which otherwise tracked the printed form simultaneously read and initialed by Doody that properly articulated his rights, were constitutionally adequate. According to the majority, "whatever the applicable standard for reviewing the state court decision, the violation of Doody's rights in this case is so absolutely clear as to compel that the Writ be granted." Maj. Opinion at 5812.

My colleagues rest their conclusion on Detective Riley's deviation from an accurate reading of the *Miranda* form, his allegedly misleading explanation of the right to counsel, and his alleged downplaying of the significance of the *Miranda* warnings. Were we reviewing this case on direct appeal, each

of these might be legitimate grounds for debate. However, to interpret these portions of the record de novo, without any regard for the state courts' careful determinations of fact or applications of law under controlling Supreme Court precedent, ignores AEDPA.[3]

The majority insists that if we properly apply AEDPA, we are actually succumbing to a "temptation to abdicate our responsibility on habeas review," and colorfully concludes that, if we follow the statute, "we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye." Maj. Opinion at 5804. It is true, of course, that we must be "vigilant and independent in reviewing petitions for the writ." *Richter*, 131 S. Ct. at 780. However, "confidence in the writ and the law it vindicates [is] undermined[ ] if there is judicial disregard for the sound and established principles that inform its proper issuance." *Id.* Our responsibility on collateral habeas review under AEDPA is not to ask how *we* see the evidence—which is what the majority does—but to ask whether how the *state courts* viewed the evidence is objectively unreasonable under clearly established federal law. In this task we have neither a rubber stamp nor an eraser, just a nuanced duty to recognize the distinct role of both state and

---

[3]The majority substitutes its judgment for that of the Arizona courts so many times that it becomes second nature, and thus, almost unnoticeable. Many times over, the majority simply disagrees with the Arizona Court of Appeals, but labels any interpretation contrary to its own "unreasonable." For example, the majority writes, "To the contrary, the audiotapes demonstrate that the detectives' relentless and uninterrupted interrogation of an unresponsive juvenile was far from 'courteous.' " Maj. Opinion at 5822. This court cannot make that determination on habeas review under AEDPA. 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Yet the majority persists, arguing that any doubt regarding this matter "is easily resolved by listening to the audiotapes." Maj. Opinion at 5821-22. Under AEDPA, it is not our role to resolve "doubt" in the factual record and then conclude that the state court was unreasonable not to see it our way.

federal courts on habeas review. *See id.* at 787 ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.").

It's called comity—a binding constitutional concept which the Supreme Court has all too often reminded us we must respect when it has reversed our AEDPA decisions. *See, e.g.*, *id.* at 14 ([The Ninth Circuit's] analysis illustrates a lack of deference to the state court's determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system."); *Woodford*, 537 U.S. at 24 (per curiam) (noting that our "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law" and inconsistent with AEDPA, "which demands that state court decisions be given the benefit of the doubt").

If the majority thinks that AEDPA's unreasonableness standard, properly applied, is a difficult one for petitioners to meet, "that is because it was meant to be." *Richter*, 131 S. Ct. at 786. AEDPA

> preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedent. It goes no further. Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307. 332 n.5 (1979)).

Our duty in this case is therefore simply to ask whether there is any possibility that fairminded jurists could disagree that the Arizona Court of Appeals' decision contravened then-available Supreme Court precedent. In *Prysock* and *Duckworth*, and now again in *Powell*, the Supreme Court has explicitly and repeatedly condoned deviations from a formulaic *Miranda* script. *Duckworth* further allows for additional and even misleading elaborating statements that "inadvertently depart from routine practice." *492 U.S. at 203.* Fairminded jurists could conclude that this precedent permits a less-than-accurate oral recitation and explanation of a valid printed *Miranda* form that a suspect is given to read. (The original three-judge panel in this case, including two members of the en banc majority, found that it did the first time around. *Doody*, 548 F.3d at 863.) The decision of the Arizona Court of Appeals was therefore not unreasonable if AEDPA is properly applied.

Detective Riley's oral *Miranda* delivery is not a model of English diction. However, especially when considered together with the written warnings form, it does touch all of *Miranda*'s bases: the four essential components are easily identifiable, and nearly all of the additional material clarifies, rather than obfuscates. The oral warnings are even clearer when heard on the audio tape, rather than read as printed snippets in the majority's opinion. The colloquial filler ("ah," "like," "and things," "okay," etc.), which is distracting on the page, is largely filtered out when heard by the average listener. Even those of us who spend our days striking every unnecessary word from our written work commonly make, and hear, statements of less than perfect prose. We are nonetheless able to communicate and understand serious ideas. Moreover, the written warnings, which lacked colloquial filler or lengthy elaboration, were simultaneously set before Doody and expressly acknowledged by him. *See* Appendix. It was

not unreasonable for the Arizona Court of Appeals to conclude that the combination of written and spoken warnings reasonably conveyed the essential rights to a young, emancipated man like Doody.

Nor was it unreasonable to conclude that Detective Riley's elaboration on the definition of "attorney" did not fatally obscure the fundamental import of the right to counsel during interrogation. My colleagues complain that his ambiguous explanation could be construed to suggest that one only has a right to an attorney if he is guilty. True. It could be construed that way, just like the explanation that a lawyer would be appointed "if and when you go to court" in *Duckworth*, even if technically correct, could have been construed by a suspect to suggest that he only had the right to an attorney before or during questioning if he could afford to hire his own. *Duckworth* nonetheless held that the warnings in that case "in their totality, satisfied *Miranda*." 492 U.S. at 205.

*Duckworth* addressed different facts from the ones before us, but it was not objectively unreasonable for the Arizona Court of Appeals to conclude the "circumstances in their totality" counseled the same result here. *Doody*, 930 P.2d at 443. While part of Detective Riley's explanation may have been ambiguous, the four essential *Miranda* warnings themselves were stated correctly, and Doody was simultaneously looking at a written form that clearly laid out the warnings without any problematic elaboration. See Appendix. Doody's receipt and acknowledgment of the written warnings, which no one claims were incorrect, could certainly have alleviated any ambiguity or misinterpretation.

To make the argument that the warnings given to Doody did not satisfy Miranda, the Chief Judge's concurring opinion approaches the record de novo and asks us to imagine that Detective Riley's spoken words were printed on a state-produced form and given to Doody to initial. *See* Concurrence at 5846-47. But, even if we were on direct review, and even

assuming that Detective Riley's spoken words would be insufficient if presented on a printed form, that does not decide this case because that is not the test we apply. We do not reduce all that is spoken into writing in order to "examine the words employed as if construing a will or defining the terms of an easement." *Powell*, 130 S. Ct. at 1204. Instead, we assess Miranda warnings "in their totality" and "in context." *Id.* at 1204, 1205. Thus, just as we should not isolate and emphasize only one component of a warning*, see id.* at 1204, we should not isolate Detective Riley's passing oral explanations and give them unnatural emphasis through the imprimatur of an official form. After all, the concurrence's reliance on this hypothetical only helps make the point that printed words often carry more import than passing speech.

What should instead be done to properly assess the warnings given to Doody "in their totality" and "in context" is exactly what the state trial court did when, in the course of an extensive evidentiary hearing, it heard the audio tape of the warnings, saw the juvenile *Miranda* form with Doody's initials, and listened to the administering officers testify that Doody "exhibited no signs of doubt or confusion." *Doody*, 930 P.2d at 449. The Arizona courts then concluded the warnings were adequate. *Id.* Because we are on habeas review, we must accord AEDPA deference to that conclusion by asking whether it could be supported by theories that are not inconsistent with Supreme Court precedent, rather than engaging in a de novo analysis and comparing the results. *See Richter*, 131 S. Ct. at 736. Under *Duckworth*, a state court could reasonably conclude that the effect of the combined oral and written warnings was to "touch[ ] all of the bases required by *Miranda*," and "reasonably convey" to Doody his rights. 492 U.S. at 203. This is especially so since the Supreme Court has not indicated what effect simultaneously acknowledged written warnings might have when the oral warnings are unclear. Although the Chief Judge declares that "it would be unreasonable" to conclude that the combined warnings were adequate, Concurrence at 5851, without Supreme Court precedent on

point, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' " *See Musladin*, 549 U.S. at 77 (quoting 28 U.S.C. § 2254(d)(1)).

Finally, the majority faults the Arizona Court of Appeals for failing to conclude that Detective Riley's *Miranda* delivery, because it offered "repeated assurances" to Doody and was long-winded, impermissibly downplayed the significance of the warnings. Maj. Opinion at 5803. Certainly, *Miranda* establishes the general proposition that the warnings should serve "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda*, 384 U.S. at 469. However, contrary to the majority's suggestion, there is no Supreme Court precedent that should have compelled the Arizona Court of Appeals to conclude that the detective's verbosity or "good cop" demeanor violated this general rule. And "it is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific rule that has not been squarely established by [the Supreme Court]." *Knowles*, 129 S.Ct. at 1419; *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

It was not unreasonable for the Arizona court to conclude from the totality of the circumstances that Doody was aware of the gravity of his situation. What Doody characterizes as "reassuring patter" intentionally designed to "obscure and downplay" the importance of the warnings can be reasonably interpreted as explanation designed to focus Doody's attention on what was being said. Although the explanations and tone were calibrated to put Doody at ease, Detective Riley did not joke or make light of the warnings. *Cf. Cooper v. Dupnik*, 963 F.2d 1220, 1228-29 (9th Cir. 1992) (en banc), *overruled on other grounds by Chavez v. Martinez*, 538 U.S. 760 (2003). Doody knew from the moment he got into the police car that the officers intended to question him about the murder

weapon. Detective Riley clearly told Doody "anything that you tell me I can use later against you in court," and told him a judge would decide whether he had done something wrong, and if so, that he would be punished. Doody was therefore "aware not only of the privilege, but also of the consequences of forgoing it." *Miranda*, 384 U.S. at 469.

The Arizona Court of Appeals' conclusion that the spoken and written *Miranda* warnings delivered to Doody were sufficient was not an objectively unreasonable application of federal law as established by *Miranda*, *Prysock*, and *Duckworth*, and as recently reiterated by *Powell*. The majority's contrary conclusion rests on its de novo interpretation of the record and total disregard for the state courts' factual findings and reasoned legal conclusions, in contravention of AEDPA.

## IV

Whether *Miranda* warnings were adequate and whether a confession was voluntary are closely related inquiries. "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility." *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004) (plurality opinion) (footnote omitted). Because I would conclude the warnings were adequate, I proceed to consider the other circumstances relevant to the question of voluntariness. Because the majority would conclude the warnings were inadequate, its voluntariness analysis is gratuitous, highlighting a dogged determination to quarrel with the factual record as much as possible.

"[C]ourts look to the totality of circumstances to determine whether a confession was voluntary." *Winthrow v. Williams*, 507 U.S. 680, 693 (1993). Those circumstances include police coercion; the length of the interrogation; its location; its continuity; and the defendant's maturity, education, physical con-

dition, and mental health. *Id*. Issuance of valid *Miranda* warnings is a particularly weighty factor: "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984).

To overcome the factual obstacles, the majority attempts to paint Doody as a tender youth, lacking intellect or sophistication, younger than his chronological age of seventeen-and-one-half years.[4] But the facts as found here by the Arizona judges do not support such a characterization. The Arizona Court of Appeals reviewed the evidence presented at the ten-day evidentiary hearing, including all thirteen hours of the audio-taped interrogation. It made, or adopted from the trial court, a number of express factual findings supporting its legal analysis. These findings recite Doody's age, education, and school activities, including that he was six months from the age of majority, maintained a B grade average, held the position of commander of the ROTC Honor Guard and Color Guard, was employed on the military base, and that he spoke English fluently and displayed no signs of mental disability. *Doody*, 930 P.2d at 445-46.

The Arizona Court of Appeals also concluded Doody was adequately informed of his *Miranda* rights. It found that, although the interview lasted nearly thirteen hours, Doody made an inculpatory statement after about two and one-half hours by admitting to borrowing the murder weapon and began to make a full confession after about six hours. "The detectives used a variety of approaches in questioning Doody"

---

[4]Particularly indicative is the majority's heavy reliance on the Supreme Court's 1948 opinion in *Haley v. Ohio*, 332 U.S. 596, 598 (1948), where the Court characterized the suspect—questioned for five hours straight and, as he maintained, beaten—as a fifteen-year-old "lad" still living with his mother. *Id.*

but maintained a "courteous, almost pleading style of questioning during most of the interview." *Id.* at 446. The detectives allowed Doody to take bathroom breaks and offered him food and drinks throughout the interrogation.[5] *Id.* The court also carefully noted the jury's voluntariness finding: "[i]n this case, as in all others, the jury was the ultimate arbiter of voluntariness, and [was] free, in effect, [to] disagree with the judge, and reject the confession." *Id.* at 448 (quotation omitted, alterations in original).

The Arizona Court of Appeals identified the correct federal constitutional standards, looking to "the totality of the circumstances surrounding the confession" to determine "whether the will of the defendant [had] been overborne."[6] *Id.* at 445. The court also noted that juvenile confessions require the " 'greatest care,' " and proceeded to " 'evaluate whether police conduct was coercive in the context of a juvenile confession by carefully scrutinizing not only the external circumstances under which the juvenile was questioned but also the juvenile's reasonably apparent cognitive abilities.' " *Id.* (quoting *State v. Jimenez*, 799 P.2d 785, 790 (Ariz. 1990)).

Applying this standard to the facts found above, the court concluded the confession was voluntary. It did not make this

[5]The majority faults the officers because according to its interpretation of the transcript the first break comes nine hours into the interview. Maj. Opinion at 5818. Yet, the officers paused questioning less than four hours into the interview to offer Doody something to drink and a bathroom break. At the end of Tape 3, Detective Riley asks, "Are you a little thirsty?" Doody responds, "Not quite, no." Detective Riley then inquires, "You sure? You look like you're a little bit thirsty, you want to go to the bathroom or anything?" Doody states, "No." Detective Riley then confirms, "You sure? Okay." The majority's suggestion that the officers were insensitive to Doody's need for relief throughout the interrogation is belied by this record.

[6]The majority inexplicably asserts the state court unreasonably applied federal law by failing to weigh "the totality of the circumstances." Maj. Opinion at 5825.

determination lightly or casually. The court noted each of the most disturbing circumstances and cited specific facts that counter-balanced those concerns. The "troublesome length" of the interrogation was offset by the fact that Doody had admitted after only two and one-half hours that he had possessed the murder weapon and confessed to participating in the temple robbery approximately four hours later. *Id.* at 446. The interrogation lasted through the night, but the audio tapes confirmed the officers' testimony that Doody did not seem overly tired or distraught. *Id.* The officers engaged in numerous interrogation techniques, which the trial court characterized as "aggressive, energetic [and] forceful," *id.*, but they were not egregious or beyond the bounds of federal law, *id.* at 447-48.

Doody did not have a parent present, but, as the court noted, he had said he "did not care" whether his parents were there and agreed to speak to the detectives alone. *Id.* at 446. He was also living on his own with friends, not with his family. On the basis of this extensive and thoughtful analysis, the Arizona Court of Appeals concluded the confession was voluntary. As Chief Judge Kozinski's concurrence correctly recognizes, "[t]his is precisely the kind of debatable application of a 'general standard' where finality and respect for the independent judgment of the state courts counsels the highest deference on federal habeas review." Concurrence at 5843-44 (citing *Knowles*, 129 S. Ct. at 1420).

The majority cannot point to any significant fact or circumstance that the Arizona Court of Appeals failed to consider in reaching this conclusion. The majority claims Doody's age is of "critical importance." Of course it is important. That is why the Arizona court explicitly considered it. *Doody*, 930 P.2d at 445 (noting Doody's age and reciting the correct legal standard for review of juvenile confessions). The court noted several facts showing Doody was mature for his age, including that he commanded the ROTC Honor Guard and Color Guard and held a job at the Luke Air Force Base commissary, *id.*;

evidence in the record further showed that Doody was the oldest of four children, lived in an apartment emancipated from his parents, signed his apartment lease for himself and his roommates, bought two cars on his own, and participated in the Civil Air Patrol, which comported with his plans for college and possibly joining the Air Force or Navy as a pilot. These facts no doubt explain why the Superior Court of Arizona had ordered Doody to stand trial as an adult, rather than as a juvenile offender. *Id.* at 444.

The Arizona Court of Appeals also discussed the possibility of police coercion, *id.* at 447-48; the length of the interrogation, *id.* at 446; its continuity, *id.* (noting that the interrogation lasted thirteen hours without significant breaks but also that the officers "offered Doody food and drinks and accommodated his requests to use the restroom"); and Doody's maturity, education, physical condition, and mental health, *id.* at 445-46 (discussing Doody's education, grade average, school activities, condition during the interrogation, and that there was "no indication of any mental disorder").[7] *See Winthrow*, 507 U.S. at 693 (requiring consideration of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health). Of course, the court also devoted an entire section of the opinion to the *Miranda* warnings. *Doody*, 930 P.2d at 448-49.

The state court correctly applied federal law to its factual conclusions. Each relevant circumstance, and many combinations of similar circumstances, have been addressed by the

---

[7]The only factor the Arizona Court of Appeals apparently omitted was the location of the interrogation. Other than noting the interview took place at the police station, the state court did not describe the physical surroundings. If anything, this factor would cut in favor of voluntariness. In contrast to a typical stark interrogation room, Doody's interrogation took place in what had been the office of a Maricopa County attorney, roughly ten feet by eighteen feet in size, well-lit, with carpeted floors and padded chairs. The officers did not lock the door.

Supreme Court and circuit courts of appeal,[8] and the resulting confessions held voluntary. We have repeatedly held a suspect's minor age and the absence of a parent do not make a confession presumptively involuntary. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (fifteen-year-old suspect's confession voluntary though police implored him to cooperate and misrepresented legal implications of admitting involvement); *United States v. Doe*, 155 F.3d 1070, 1075-76 (9th Cir. 1998) (en banc) (seventeen-year-old suspect's *Miranda* waiver and confession were voluntary, even though his parents were not present, where juvenile did not appear to be intoxicated, was not handcuffed, did not have trouble understanding the questions, the investigating officers did not make any threats or promises of any kind, and juvenile never asked that his parents be notified or that they be present).

Federal courts have also held lengthy interrogations are not per se coercive. *See Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (defendant's confession was voluntary though he had been held and intermittently questioned in a small room for eight hours); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (six or seven hour questioning not coercive); *United States v. Lehman*, 468 F.2d 93, 101 (7th Cir. 1972) ("vigorous" eight-hour questioning with few breaks did not make confession involuntary). "Even if we assume that the interrogation lasted all day . . . coercion typically involves far more outrageous conduct." *United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003).

The majority attempts to distinguish these cases as not involving both a seventeen-year-old suspect and a thirteen-hour interview. However, the Supreme Court has not

---

[8]"While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (internal citations omitted).

addressed a case with facts such as those presented here. The majority does not claim that the Court has, yet it nevertheless concludes that the Arizona Court of Appeals not only incorrectly, but unreasonably, applied nonexistent Supreme Court precedent. Such a holding is not only violative of § 2254(d), *see Knowles*, 129 S. Ct. at 1419, but is also wholly irrational. While a right may be clearly established even without a Supreme Court case addressing materially indistinguishable facts, the majority cannot point to a single case that would have put the Arizona court on notice of a per se rule that a defendant of Doody's age and maturity cannot make a voluntary confession six hours into a thirteen-hour interview.

In fact, the case that serves as the backbone of the majority's attempt to refute this dissent, *Haley*, 332 U.S. at 600, is readily distinguishable. In *Haley*, the defendant was a fifteen-year-old African American "lad" in 1945 Ohio, *id.*, arrested at his home where he lived with his "closest friend—his mother," *id.*, taken to police headquarters, reportedly beaten, denied contact with his mother, and "not advised that he was not obliged to talk, that it was his right if he chose to say not a word, nor that he was entitled to have the benefit of counsel or the help of his family," *id.* at 604. The chief of police even "admitted that while he knew the boy 'had the right to remain mute and not answer any questions,' he did not know that it was the duty of the police to apprise him of that fact." *Id.*

Here, valid pre-printed *Miranda* warnings were read to Doody before the disputed explanations; the officers did not beat Doody; Doody was held for thirteen hours rather than "days," *id.*; the officers expressly asked Doody if he wanted his parents present; the officers knew, and advised Doody, that he had the right to remain silent; and most importantly, Doody was not a fifteen-year-old "lad" living with his closest friend—his mother—but was instead a seventeen-and-one-half-year-old commander of the ROTC Honor Guard living

independently of his parents with his closest friend—the pro-
vider of the murder weapon—Rolando Caratachea.[9]

The majority argues that the Arizona Court of Appeals
should have been mindful of the "tender age" of Doody, just
as the Supreme Court was mindful of the "tender age" of
Haley. Notwithstanding the materially distinguishable facts of
the two cases, the court did expressly consider Doody's age.
*Doody*, 930 P.2d at 449. "More to the point, the question is
not whether a state court could plausibly extend *Haley* to this
fact pattern, a point we need not decide; the question is
whether the [state] courts acted unreasonably in declining to
extend this pre-*Miranda* precedent here. They did not." *Jack-
son*, 525 F.3d at 435.

Nor were the Arizona courts required to find "outrageous
conduct" in the officers' interrogation tactics. "The policeman
is not a fiduciary of the suspect. The police are allowed to
play on a suspect's ignorance, his anxieties, his fears, and his
uncertainties; they just are not allowed to magnify those fears,
uncertainties, and so forth to the point where rational decision
becomes impossible." *United States v. Rutledge*, 900 F.2d
1127, 1130 (7th Cir. 1990). Absent physical coercion, police
are permitted to engage in a variety of psychologically coer-
cive interrogation tactics. *See Haynes v. Washington*, 373
U.S. 503, 514-15 (1963). The officers here employed most of
them: the good cop/bad cop routine, lecturing on the impor-

---

[9]We would not be the first circuit to distinguish *Haley* on such bases.
*See United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir.
1975) (distinguishing on the basis that suspect was "informed of his right
to remain silent"), *overruled on other grounds by Patterson v. Cuyler*, 729
F.2d 925 (3d Cir. 1984); *Rogers v. Quarterman*, 555 F.3d 483, 495 (5th
Cir. 2009) (distinguishing on the basis that suspect was not "subjected to
physical abuse" and was "detained for a period of hours rather than
days"); *Jackson v. McKee*, 525 F.3d 430, 435 (6th Cir. 2008) (distinguish-
ing on the basis that suspect "by contrast, was older (17 years old)"); *Har-
daway v. Young*, 302 F.3d 757, 763 (7th Cir. 2002) (distinguishing on the
basis that suspect "was held for less than one day rather than three").

tance of telling the truth, appeals to Doody's courage and honor, urging him to act like a man, advising him that other participants were talking and pointing fingers at Doody, expressing concern for the safety of Doody's family, and plain dogged persistence in their questioning.

These techniques are not new. Nor are they unconstitutional. For instance, police may encourage a suspect to cooperate and imply the suspect will be treated leniently for doing so. *See Rutledge*, 900 F.2d at 1128, 1130, 1131 (finding confession voluntary where police made "not quite truthful" statement that "all cooperation is helpful," though confession actually exposed Rutledge to a heavier sentence). This is true even when the suspect is a juvenile. We have upheld voluntariness findings where officers implored a fifteen-year-old suspect to cooperate and "misrepresented the serious potential legal consequences [the suspect] would face were he to admit involvement." *Juan H.*, 408 F.3d at 1273. "It is not enough, even in the case of a juvenile, that the police 'indicate that a cooperative attitude would be to [the] benefit' of an accused unless such remarks rise to the level of being 'threatening or coercive.' " *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 727 (1979)).

Deception is also a permitted tactic. "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). " '[T]rickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect.' " *United States v. Crawford*, 372 F.3d 1048, 1061 (9th Cir. 2004) (quoting *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998)); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that confession was voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to the crime).

Persistent questioning must be permissible, for "[f]ew criminals feel impelled to confess to the police purely of their own accord, without any questioning at all." *Miller v. Fenton*, 796 F.2d 598, 604-05 (3d Cir. 1986) (citing *Stein v. New York*, 346 U.S. 156, 186 (1953) ("Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary."), *overruled on other grounds by Jackson v. Denno*, 378 U.S. 368, 391 (1964)); *see also Haynes*, 373 U.S. at 514-15 ("Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement."). Although the officers were persistent, they were not coercive, and the Arizona courts reasonably concluded Doody's "confession [was] the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

Contrast the circumstances of Doody's interrogation with other Supreme Court cases finding truly coercive circumstances. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 396-402 (1978) (suspect interrogated for four hours in intensive care unit, with tubes in his throat and nose, heavily medicated, after being shot, despite explicit request for counsel); *Darwin v. Connecticut*, 391 U.S. 346, 347-49 (1968) (per curiam) (suspect interrogated for 48 hours incommunicado while officers denied access to counsel); *Greenwald v. Wisconsin*, 390 U.S. 519, 519-21 (1968) (per curiam) (defendant, with a ninth-grade education, was questioned without *Miranda* warnings for over eighteen hours and prevented from eating, sleeping, and taking his medication); *Beecher v. Alabama*, 389 U.S. 35, 36-38 (1967) (per curiam) (officer fired rifle next to suspect's ear and said "If you don't tell the truth I am

going to kill you"); *Clewis v. Texas*, 386 U.S. 707, 709-12 (1967) (suspect was arrested without probable cause, interrogated for nine days with little food or sleep, and gave three unwarned "confessions," each of which he immediately retracted); *Davis v. North Carolina*, 384 U.S. 737, 745-53 (1966) (defendant was interrogated "daily" for sixteen days, during which no one other than the police spoke to him, and during which he was fed an "extremely limited" diet); *Reck v. Pate*, 367 U.S. 433, 439-42, n.3 (1961) (mentally disabled youth interrogated incommunicado for a week "during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher"). It was entirely reasonable for the Arizona courts to conclude Doody's confession did not fall into this category.

In light of the Arizona courts' extensive findings and careful application of federal law, the best the majority can do is to mischaracterize the state court findings and reevaluate the record. The majority first attacks the Arizona Court of Appeals' finding that Doody was "alert and responsive," claiming he was actually non-responsive and often silent.[10] But the court never said Doody spoke constantly or answered every question, and it explicitly noted that "Doody did not speak for long periods during the interrogation." *Doody*, 930 P.2d at 447. The majority wants to interpret Doody's failure to answer certain questions as "unresponsive." The Arizona court obviously viewed his failure to immediately answer in a more sinister light; Doody could have been thinking up a tale explaining his admission that he was at the murder scene in a non-incriminatory fashion. Doody ultimately admitted that he was at the Buddhist temple but claimed to be outside when the murders occurred.

---

[10]The majority neglects to mention that Doody becomes talkative, forthcoming, and almost chatty in the last several hours of the interrogation. He provides most of the details of the crime with minimal prompting from the officers.

The finding that he was "alert and responsive" was not unreasonable, even in light of Doody's silence, for there is more to alertness than perpetual chatter. Doody could certainly have been pondering the consequences of truthfully answering the detectives' questions. Of course, silence may be indicative of inattention or unresponsiveness, but visual clues and physical demeanor must also be considered. The majority goes to great length to note that Doody sat in a chair with a "straight, immobile back." Maj. Opinion at 5819 n.8; *see also id.* at 5814-15, 5825. If anything, this would bolster the detectives' observations as to Doody's alert and responsive demeanor. The audio tapes, though certainly better than a cold transcript, cannot provide this information. Only the detectives who interrogated Doody could provide that, and they swore that Doody was "alert and responsive throughout the interrogation and did not appear overtired or distraught." *Doody*, 930 P.2d at 446. Doody declined to testify at the evidentiary hearing, so the record is devoid of direct evidence contradicting the officers' description. *Id.*

Because the trial court explicitly credited that testimony, the majority commits reversible error in dismissing the state court's finding as an "unreasonable determination of the facts." The majority instead misconstrues the limits of our review under § 2254(d). The majority argues that "assuming that there was *equivocal* evidence of responsiveness, the Arizona Court of Appeals' finding that *no evidence* supported Doody's claim was *unreasonable*." Maj. Opinion at 5821 (first and third emphases added). Yet, because "Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect,' a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision" was erroneous or incorrect. *Williams*, 529 U.S. at 366. The majority fundamentally alters the permissible scope of our review by ignoring this distinction. *See Richter*, 131 S. Ct. at 786; *Uttecht*, 551 U.S. at 10.

The majority next deems unreasonable the finding that "the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview." *Doody*, 930 P.2d at 446; *see* Maj. Opinion at 5821-22. The majority reviews the tapes and scolds that the officers' tones were "far from pleasant." Maj. Opinion at 5822. This was no tea party. The Arizona court did not treat it like one. The officers were unquestionably persistent in seeking, and sometimes demanding, information from a suspected mass murderer. That is what we pay them to do. But it is entirely accurate to say the officers were "courteous, almost pleading" for "*most* of the interview." *Doody*, 930 P.2d at 446 (emphasis added). Finding a courteous tone for *most* of the interview does not conflict with the fact that the officers were *sometimes* sarcastic, demeaning, and unpleasant.

For hours at a time, the officers pleaded, cajoled, and implored in soft voices. Their questions were nearly inaudible on the tape at some points. For several additional hours, particularly at the beginning and end of the interview, the officers asked questions in conversational tones. Even in the early hours of the morning, when the officers were most demanding and unpleasant, they did not scream or shout. They did not threaten Doody in any way. They did not pound the table or throw objects around the room. They did not put words in Doody's mouth as to how the murders had been planned or committed. If we are going to say that mere persistence in interrogation renders a confession involuntary, and that a suspect's will is overborne by insistently repeated questions, and moreover that it's objectively unreasonable for a court to decide otherwise, then there is no rational stopping point in our voluntariness analysis.[11]

---

[11]The majority's conclusion that the police "undoubtedly" used the same interrogation techniques against Doody as they did in procuring the Tucson Four's confessions, Maj. Opinion at 5822, is remarkable, considering the Arizona Court of Appeals found that Doody had waived that contention as part of a due process claim. He convinced the trial court to

Indefatigable in its mischaracterization of the state court's findings, the majority next claims that, "contrary to the finding of the Arizona Court of Appeals, Doody decidedly did *not* admit to involvement in the temple murders after two and one-half hours of questioning." Maj. Opinion at 5823. The court of appeals did *not* say Doody "admitted to involvement" after two and a half hours. It said, "Doody admitted he had borrowed Caratachea's rifle at the time of the temple murders." *Doody*, 930 P.2d at 446. This is a reasonable finding of fact. It is also a significant admission because it contradicts the lie he told at the outset of the interview that he had never had possession of the rifle. Doody said he borrowed the rifle "close to the end of June." The murders occurred in August. Considering the Arizona Court of Appeals reviewed the case roughly five years later, "at the time" reasonably describes the time frame. It is disingenuous to rewrite the state court's findings in order to declare them "patently unreasonable." Maj. Opinion at 5824. Although not conclusive, the inculpatory admission that he possessed the murder weapon before the temple invasion provided a strong basis for the officers to believe Doody had some involvement in the robbery and murders, contrary to his initial denial when first questioned.

Finally, the majority faults the Arizona Court of Appeals for analyzing "the individual circumstances of the interrogation without weighing the totality of the circumstances." Maj. Opinion at 5825. Given that federal law requires state courts to examine a long list of particular factors, this criticism is

admit the Tucson Four's confessions by arguing they were *true* and reasonably showed someone else committed the crime. *Doody*, 930 P.2d at 449-50. The court of appeals also found that Doody made "no [ ] showing" in state court that the circumstances of the Tucson Four confessions were relevant to his own, and that "the record disclose[d] substantial differences in approach and questioners" between Doody's and the Tucson Four's interrogations. *Id*. at 450-51. Doody fails to challenge these state court findings on appeal, while the majority simply ignores them, again in disregard of AEDPA.

utterly confounding. Had the state court merely alluded to a vast morass of evidence and stated a summary conclusion, we might arguably reverse for failure to explicitly consider all the relevant circumstances. The majority now implies that individual consideration of each important factor is error. A state court earnestly trying to follow our conflicting dictates might as well throw in the towel.

## V

The majority's lengthy recital of the facts highlights the fundamental error in its approach. Despite the prolific factual recitation, the majority leaves key sentences, exchanges, and pages of transcript unaccounted for. The majority quips that the dissent would "prefer that these audiotapes not see the light of day." Maj. Opinion at 5839 n.14. To the contrary, if the majority is going to ignore AEDPA and parse the record, then *all* of the transcripts should see the light of day, not just pre-selected snippets. Rather than deferring to the reasoned decisions of the Arizona courts, which listened to the tapes *in toto*, the majority re-weighs the facts, parses the transcript, and dismissively ignores the state court's findings. The opinion once again manifests judicial disregard of our role as federal appellate judges and the comity enshrined in AEDPA's statutory commands. *See Richter*, 131 U.S. at 780, 786-87.

The Arizona courts did everything we can demand of state courts. The trial court held a ten-day evidentiary hearing before concluding the *Miranda* warnings were adequate and the confession was voluntary. More importantly, the jury independently and necessarily concluded the confession was voluntary and reliable in convicting Doody for his role in the murders. The Arizona Court of Appeals affirmed this determination in a comprehensive, reasoned opinion. Its holding on the facts presented fell squarely within the bounds of Supreme Court precedent on voluntariness. In sum, sixteen Arizona factfinders concluded Doody's confession was voluntary. Presumably at least some of them were "fairminded jurists."

AEDPA at 28 U.S.C. § 2254(e)(1) cloaks those findings with a presumption of correctness. Doody fails to meet his statutory burden to rebut them by "clear and convincing evidence." *Id.*

In violation of AEDPA, the majority adjusts the scales and weighs the facts anew. This sort of appellate factfinding on habeas review is contrary to the congressionally mandated standard of review. It also creates unpredictability for habeas petitioners, attorneys, and state and federal courts. "We have been told before that objectively *unreasonable* means something more than we think the state courts were wrong. '[A]n unreasonable application of federal law is different from an *incorrect* application.' " *Anderson v. Terhune*, 516 F.3d 781, 800 (9th Cir. 2008) (en banc) (Tallman, J., dissenting) (quoting *Williams*, 529 U.S. at 410). Such careless dismissal of reasoned findings is demoralizing and insulting to the state courts, eschewing the principle that "comity between state and federal courts has been recognized as a bulwark of the federal system." *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *see also Richter*, 131 S. Ct. at 786-87.

With little more than a hat tip to the Arizona courts' extensive findings, the majority nonetheless concludes these findings were "objectively unreasonable." The majority's message to our state courts is clear: no matter how carefully you decide constitutional issues in criminal cases, no matter how well you justify your opinions with evidence of record, we will cast your work aside simply because we disagree. We should instead heed the dictates of the United States Supreme Court and give the reasonable findings of the Arizona courts the deference due under AEDPA. I respectfully dissent.

**Appendix**

#159

## JUVENILE MIRANDA WARNINGS

Date/Time: _OCTOBER 25, 1991  9:25 P.M._     DR # _91-16695_

Location: _MAJOR CRIMES TASK FORCE_

Officer: _P. RILEY_       Serial Number: _679_

Subject: _JONATHAN A. DOODY_       Age/DOB: _17   5-9-74_

Address: _13235 W. TICKEY LN. GLENDALE, AZ. 85307_

Subject's Signature: _____

Juvenile's present grade in school? _11_ If juvenile is not in school, last grade completed? _N/A_ (Self-reported)

Juvenile's reported performance in school? _B AVERAGE_

These are your Miranda Warnings:
(Subject shall place his initials in the blank following the "Yes" or "No" response, as appropriate.)

1. You have the right to remain silent. (This means that you do not have to talk to me or answer any questions about this offense. You can be quiet if you wish.) Do you understand this?  Yes _JAD_  No _____

Anything you say can and will be used against you in a court of law. (This means that anything you tell me, I can use later against you in court. A court of law is a place where a judge will decide whether you did [explain what the juvenile is suspected of]. A judge is like an umpire in a baseball game. He decides whether you have acted in a right or wrong way. If you did something wrong, you may be punished.) Do you understand this right?  Yes _JAD_  No _____

3. You have the right to have an attorney present prior to and during questioning. (This means, if you want one, you are allowed to have a lawyer here before and during my questions to you. An attorney is a lawyer who will speak for you and help you concerning the crime which we think you have done.) Do you understand this right?  Yes _JAD_  No _____

4. If you cannot afford an attorney, you have the right to have one appointed for you prior to questioning. (This means if you do not have the money to get a lawyer, if you wish, one will be given to you free of charge before you are questioned.) Do you understand this right?  Yes _JAD_  No _____

5. Do you want to have your parent(s) or guardian(s) present during questioning?  Yes _____  No _JAD_

6. The possibility exists that your case may be handled by adult court. (This means that a juvenile judge may decide that you do not belong in juvenile court because you are too old, have committed a serious crime, or have committed too many crimes before this one. If you are taken to adult court, you may get more punishment than you would receive in juvenile court.) Do you understand this?  Yes _JAD_  No _____

If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Do you understand each of these rights?  Yes _JAD_  No _____